**UNITED STATES of America, Appellant,**

v.

**Fred D. TEMPLE, Appellee.**

Nos. 21822, 21823.

United States Court of Appeals Fifth Circuit.

Jan. 7, 1966.

Wisdom, Circuit Judge, dissented.

————◆————

Thomas Stapleton, Atty., Dept. of Justice, Louis F. Oberdorfer, Asst. Atty. Gen., John B. Jones, Jr., Acting Asst. Atty. Gen., Lee A. Jackson, Harry Baum, and Donald A. Williamson, Attys., Dept. of Justice, Washington, D. C., Robert E. Hauberg, U. S. Atty., Jackson, Miss., for appellant.

J. C. Floyd, J. L. Prichard, Meridian, Miss., for appellee Floyd, Cameron, Deen & Prichard, Meridian, Miss., of counsel.

Before WISDOM and COLEMAN, Circuit Judges, and DAWKINS, District Judge.

COLEMAN, Circuit Judge:

In this appeal we are concerned with a controversy between the Government and the Taxpayer as to whether the profits from certain real estate transactions were taxable as capital gains or as ordinary income derived from the sale of property held primarily for sale to customers in the ordinary course of business. After full hearing, the District Court found and held that the aforesaid profits should be treated as capital gains.

The Government seeks to overturn that judgment on the ground that it "lacks a reasonable basis in the facts of record, is contrary to the whole purport of the capital gains provisions, and results from the application of an erroneous legal standard to the evidence". Stating it another way, the Government further contends that whether the District Court's ultimate findings be deemed a determination of fact, or of law, or of mixed law and fact, or ultimate fact springing from undisputed evidentiary facts, it is clear that the determination is not supported by the facts nor the law, and should, therefore, be reversed.

Upon a careful consideration of the entire record, and after hearing argument of counsel, we cannot confidently agree with these contentions.

■■■ About the best that can be said of these capital gains controversies is that each case must be decided on its own peculiar facts. Thompson v. Commissioner of Internal Revenue, 5 Cir., 322 F.2d 122. There is not much dispute, if any, about the facts. The real issue is that the Government disagrees with the inferences and conclusions which the trial court drew from the facts. The record reveals about seventeen facts or factual inferences in support of the findings below. There are about ten facts or factual inferences which could have supported a finding for the Government. Thus we see a situation in which the Court below could have decided either way without being clearly in error.

In this state of the record we find no legal justification for reversal and the judgment is

Affirmed.

WISDOM, Circuit Judge (dissenting):

I respectfully dissent. With deference to my brothers' judgment in the matter, I consider the decision below egregiously erroneous. I would hold that, within the meaning of Section 117(a) (1) (A) of the 1939 Code and Section 1221 of the 1954 Code, the taxpayer was in the business of subdividing real estate and holding the lots for sale to customers.

I suggest that the Court's "excessive deference to triers of fact" has led it into error.[1] As the Court observed, "The real issue is that the Government disagrees with the inferences and conclusions which the trial court drew from the facts". In similar circumstances, we have said:

"The burden [of showing that a finding of fact is clearly erroneous] is lighter, much lighter, when we consider logical inferences drawn from undisputed facts or from documents, though the 'clearly erroneous' rule is still applicable. * * * Insofar, however, as the so-called 'ultimate fact' is simply the result reached by processes of legal reasoning from, or the interpretation of the legal significance of, the evidentiary facts, it is 'subject to review free of the restraining impact of the so-called "clearly erroneous" rule.' * * * As succinctly stated by Professor Moore, 'Findings of fact that are induced by an erroneous view of the law are not binding. Nor are findings that combine both fact and law, when there is error as to the law.' " Galena Oaks Corporation v. Scofield, 1954, 5 Cir., 218 F.2d 217, 219 (citations omitted.)

Fred D. Temple, the taxpayer was engaged in the roofing and supply business. January 21, 1950 he paid $300 for an option to buy, for $30,000, thirty-two acres of undeveloped property within the city limits of Meridian, Mississippi. The property was part of the campus of a defunct college. Temple exercised his option and took title April 29, 1950.

Temple testified that he bought the land as an investment for his old age; that he had no wish to subdivide. The district court found that Temple had

1. This is Dean Griswold's phrase. Griswold, Of Time and Attitudes—Professor Hart and Judge Arnold, 74 Harv.L.Rev. 81, 86–91 (1960). But cf. Wright, The Doubtful Omniscience of Appellate Courts, 41 Minn. 751 (1957).

indeed bought the land for investment purposes and that he did not deviate from this intention; that he subdivided the property only because March 29, 1950, the city of Meridian adopted an ordinance requiring subdividers to put in streets and to make certain improvements as prerequisites to securing city approval of a subdivision plan. Temple testified that he did not learn of the ordinance until July. In his deposition, however, the taxpayer said that he found out about the ordinance in talking with the city manager. This was before he exercised his option. July 10 Temple appeared before the Council and, according to the minutes of the City Council, "requested them to consider his application for the re-subdivision as filed prior to March 27, 1950, the date on which an ordinance was passed requiring certain regulations in regards to subdivision". Eventually Temple succeeded in negotiating a compromise with the city for less than full compliance with the ordinance.

The undisputed facts show that within fifteen days after acquiring the option, Temple employed an architect to draw a plan for the subdivision of the property. At about the same time, he consulted with the city manager as to the availability of streets for the tract. He also employed an engineer who prepared a topographical survey of the land and then a subdivision plan staking out the lots, blocks, and streets to conform with the architect's design. This work, which was accomplished February 6 to February 17, 1950, formed the basis for the master plan the city approved in September. All these activities occurred *before Temple took up his option and even before Meridian adopted the subdivision ordinance.*

To the tune of $12,000, the taxpayer cleared and graded the land, put in culverts, and set out streets. While this was going on, he made banking arrangements for a loan for the construction of houses, based upon the need in the area of homes to be financed by F.H.A. and veterans' loans. The sites were selected with a view toward stimulating the value of the other lots in the subdivision. The taxpayer hired a builder on a weekly salary.

A signboard with Fred Temple's name on it was put up on a corner of the tract announcing that the property was the "Morningside, Meridian's Newest Subdivision". Temple advertised in the local newspapers but spent very small sums on advertising. He did not need advertising to sell his lots. As he testified, "there was quite a demand for houses out there, and I had to make practically no effort * * * people came to me and wanted to buy them". But "merely because business was good, indeed brisk, does not make it any less in the ordinary course of such good business". Thompson v. Commissioner of Internal Revenue, 5 Cir. 1963, 322 F.2d 122.

Temple lived just a few blocks from Morningside. When he was in town, he would "usually run by there on [his] lunch hour and nearly always at quitting time on my way home".

In 1951 the taxpayer sold ten lots with houses for a total of $84,300. "They were all sold before they were built." In 1953 the taxpayer sold seven lots, five with houses, for $47,700; in 1957 nine lots for $16,900; in 1958 five lots for $11,375. By 1963 he had sold all of the one hundred lots in the subdivision.

In March, 1956 Temple employed the engineer to make a new subdivision map. The purpose of this re-subdivision was "to make the lots that were in the original subdivision larger * * * more readily saleable, more attractive".

An unusual element in this case is Temple's attempt to separate the proceeds derived from the sale of the Morningside houses from the proceeds derived from the sale of the lots. He recognized that he was in the business of selling the houses, allocated a portion of the proceeds to the houses, and reported that portion as ordinary income. Thus, admittedly the taxpayer was in the business of selling the houses but not in the busi-

ness of selling the ground under the houses.

It is difficult for me to understand how the ordinance had any compulsive effect on the taxpayer. If Temple had indeed intended to invest, that is, buy and hold for appreciation, the ordinance would have deterred any thought of subdividing. The ordinance did not apply to an investor holding land; it applied only to those proposing to subdivide a tract. The inference I draw is that Temple was so anxious to divide and sell, rather than to invest and sit, that he could not be swayed from this purpose by the toll the city exacted from active land developers.

The district court weighed the facts pointing to and away from Morningside being a business, but gave inordinate weight to the taxpayer's subjective intention at the time he acquired the option. But as this Court said, in Ackerman v. United States, 5 Cir. 1964, 335 F.2d 521, 524:

> "Even if it were undisputed and unquestioned that taxpayer acquired the property as an investment, the statute excludes from capital gains treatment property *held* for sale to customers."

There is some milk of human kindness in the tax collector. Congress enacted the capital gains treatment of profits "in situations typically involving the realization of appreciation in value accrued over a substantial period of time * * * to ameliorate the hardship of taxation of the entire gain in one year." Commissioner of Internal Revenue v. Gillette Motor Transport, Inc., 1960, 364 U.S. 130, 134, 80 S.Ct. 1497, 4 L.Ed.2d 1617. But to receive the advantage of this preferential treatment of capital gains, the taxpayer must bring himself squarely within the reach and rationale of the law.

I have no doubt that Fred Temple thought that he was "investing". In the vernacular, he was "investing". But the plain facts are that Temple did not buy the property to sit on it until its market value appreciated. He bought it to develop it. He did develop it. His business acumen and his efforts created the added value to the land. Whatever notions of investment might have been in Temple's head when he *bought* the option, within Congressional tax philosophy, he *held* the Morningside lots for sale to customers in the ordinary course of business.