**KIRBY LUMBER CORPORATION,**
Plaintiff-Appellee,

v.

**R. L. PHINNEY, District Director of Internal Revenue, Defendant-Appellant.**

No. 26718.

United States Court of Appeals
Fifth Circuit.
May 27, 1969.

Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Atty., Richard M. Roberts, Acting Asst. Atty. Gen., Harry Marselli, David E. Carmack, Gilbert E. Andrews, Attys., Dept. of Justice, Washington, D. C., John O. Jones, Leonard B. Tatar, Attys., Dept. of Justice, Fort Worth, Tex., Ted Butler, Asst. U. S. Atty., Ernest Morgan, U. S. Atty., San Antonio, Tex., for defendant-appellant.

Joe G. Roady, Houston, Tex., Fountain, Cox & Gaines, Houston, Tex., for plaintiff-appellee.

Before JOHN R. BROWN, Chief Judge, COLEMAN, Circuit Judge, and SCOTT, District Judge.

COLEMAN, Circuit Judge:

The District Director of Internal Revenue collected $29,139.55 from the Kirby Lumber Corporation as additional income taxes allegedly due on the sale of standing tie grade hardwood timber [hereinafter, tie timber] in the year 1959. Before the District Court, sitting without a jury, Kirby recovered judgment for the refund of the amount paid, plus interest. The District Director vigorously appeals. We affirm.

The District Director says that the issue is "whether the District Court erred in holding that the income realized by the Kirby Lumber Corporation in 1959 from the sale of standing tie or local log grade hardwood timber was taxable as long-term capital gain rather than as ordinary income".

The taxpayer says that the issue might more precisely be stated as "whether in the year 1959 standing tie grade hardwood timber, as real property used in the trade or business of Kirby Lumber Corporation, was property held primarily for sale to customers in the ordinary course of its trade or business".

At the close of the evidence and after argument of counsel, the District Court found as a fact and held as a matter of law that in the year 1959 the tie timber in question was not property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of its trade or business, but was real property used in the taxpayer's trade or business, entitling the taxpayer to recover under the provisions of § 1231 of the Internal Revenue Code (1954).

Against this judicial result the District Director fires a thunderous salvo:

"It is the position of the District Director on this appeal that certain findings of fact made by the District Court do not constitute an accurate reflection of the record, that some of them are clearly erroneous and that others of them are incomplete or misleading".

A critical, painstaking scrutiny of the record fails, in our opinion, to justify the barrage.

Some of the crucial facts were stipulated. As to the remainder of the record, the Director tried the generally fruitless expedient of attempting to support his contentions with his adversary's proof. The Director offered no witnesses.

At any rate, considering the stipulations and the absence of material contra-

dictions from witnesses appearing exclusively for the same side, there were no materially significant credibility issues for the trial court to settle. Thus, on this appeal, we are left only to consider the logical inferences to be drawn from undisputed facts and documents, according to the rule alluded to by Judge WISDOM in his dissenting opinion in United States v. Temple, 5 Cir., 1966, 355 F.2d 67 [citing Galena Oaks Corporation v. Scofield, 5 Cir., 1954, 218 F.2d 217, 219]. We feel, nevertheless, that there was no error, clear or otherwise.

This Court has several times addressed itself to the law applicable to the issue here presented. It may be briefly summarized as follows: Whether property has been held primarily for sale to customers in the ordinary course of his trade or business so that the proceeds are taxable as ordinary income rather than as capital gains is essentially a question of fact, with each case to be decided on its own peculiar facts. Specific factors or combinations of them are not controlling. We may consider the nature and character of the taxpayer's title, reason, purpose, and intent of acquisition and ownership, its duration, taxpayer's vocation, extent of its activities, extent and nature of efforts to sell, and such like. See United States v. Burket, 5 Cir., 1968, 402 F.2d 426; United States v. Temple, supra; Thompson v. Commissioner of Internal Revenue, 5 Cir., 1963, 322 F.2d 122; Wood v. Commissioner of Internal Revenue, 5 Cir., 1960, 276 F.2d 586; Smith v. Dunn, 5 Cir., 1955, 224 F.2d 353; Baum v. United States, 5 Cir. [decided April 18, 1969] 409 F.2d 829.

With these well established guidelines firmly before us we now consider the Findings of Fact incorporated in the memorandum of the District Court dated June 28, 1968. We cannot get the composite picture if we abridge or condense the findings. We have, therefore, decided to incorporate them at this point in toto. To avoid needless repetition in the concluding discussion we shall italicize those items which we consider to be of controlling significance.

## FINDINGS OF FACT

"[4]. Plaintiff operates on the basis of the calendar year and timely filed its corporate return for the year 1959. In such return income from sales by plaintiff of hardwood stumpage under the contracts in question was reported and treated as capital gain and not as ordinary income. Thereafter the Commissioner of Internal Revenue issued a deficiency notice proposing an assessment in the sum of $29,139.55. Plaintiff thereafter duly filed a protest against such deficiency. The Commissioner thereafter issued a 90 day deficiency notice determining that $107,924.27 received by plaintiff during 1959 from such sales of hardwood stumpage should be taxed as ordinary income. Plaintiff thereafter paid to defendant, under protest, the sum of $29,139.55 and interest due thereon in the sum of $7,399.85, for a total of $36,539.40, and filed, on November 18, 1964, its claim for refund which was, on March 5, 1965, rejected by defendant.

"[5]. Plaintiff is the successor, after bankruptcy proceedings concluded in 1936, to the property and business of Kirby Lumber Company, a Texas corporation chartered in 1901. Kirby Lumber Company was formed in such year for the purpose of cutting and manufacturing into lumber and other products pine timber from 800,000 to 1,000,000 acres of land owned by Houston Oil Company. Thereafter it began to acquire fee title to lands and timber of its own. Prior to the period 1922–1923 Kirby Lumber Company cut and manufactured only pine timber. During such time [1922–1923] it built and acquired several hardwood mills and began to cut and manufacture lumber grade hardwood timber. Kirby Lumber Company through 1936 and plaintiff thereafter were engaged in the trade or business of manufacturing and selling at wholesale both pine and

hardwood lumber and other timber products.[1]

"[6]. By the year 1950, plaintiff owned over 550,000 acres of timberlands in East Texas and western Louisiana, on which grew both pine and hardwood timber. *The land, with the timber growing thereon, was acquired for the purpose of owning, as a part of the lands, the timber to be utilized as a natural resource for production into lumber and other timber products.* It was purchased for use in the plaintiff's trade or business. *No timberland had ever been purchased by plaintiff for the purpose of resale.* The hardwood timber on plaintiff's land was and is divided generally into three grades, being lumber grade, tie and local log grade and pulpwood. While all grades of hardwood are usually found throughout the forest, there were and are 82,000 acres owned by plaintiff scattered along rivers, and known as 'bottom lands' where pine would not and does not grow, and which prior to 1950 were almost exclusively lumber grade hardwood timberlands. There are an additional 87,000 acres scattered throughout the forest which are called 'predominantly hardwood' (where, generally, former pine lands have grown up in hardwood), where the tie grade hardwood is principally found, intermingled with pine, standing on land capable of being restored to pine growth. The remainder of the acreage is termed 'predominantly pine'. To and through 1950 plaintiff owned and operated five sawmills, cutting and manufacturing both pine and lumber grade hardwood. *It had not theretofore utilized in its sawmills any tie or pulpwood, nor had it sold such grades of hardwood as stumpage.*

"[7]. In or about 1950, plaintiff's management determined to cease the production of hardwood lumber, to close down its scattered sawmills, *to construct one giant sawmill designed for the production of pine products alone,* and to begin a program of forest management called 'perpetual cut forestry', whereunder all pine productive acreage would be devoted to pine, the pine nurtured and maintained to achieve an optimum growth, and thereafter only an amount equal to annual growth would be cut, leaving the forest as a perpetual natural resource. As a constituent part of this decision to devote the productive and manufacturing effort to pine, it was determined that the 87,000 acres which were predominantly hardwood must be returned to pine. It was determined, therefore, to eradicate, consistent with market demands, all of the tie grade hardwood timber located thereon. This process was begun in 1951. It was determined, at the same time, to dispose of lumber grade hardwood, such determination being based, as well, upon the necessity of devoting all productive acreage to pine. *The last sale of manufactured hardwood lumber occurred in 1953 and none has been produced by plaintiff since that time, including 1959.* Lumber grade was disposed of by a contract with Hillyer-Deutsch-Edwards, a substantial hardwood lumber manufacturer, pursuant to which Kirby employed contractors to cut the hardwood and sold the trees as logs. The 82,000 scattered 'bottom land' acres, where pine does not grow, were logged under the Hillyer-Deutsch-Edwards contract and were thereafter removed from use in plaintiff's trade or business. In addition, the disposal of pulpwood hardwood was be-

1. Footnote by this Court:

   The Director says that this finding is "incomplete and misleading, for taxpayer also sold hardwood timber (*not tie grade*) as stumpage prior to 1949 and tie grade hardwood timber as cut logs". This complaint is raised because an officer of the corporation testified "there was *some* timber sold during the depression, I am rather certain, and then there was *some* sold in the late *forties*" (emphasis added). There is no proof as to the amount or the circumstances of the sales. This was prior to the inauguration of the program of 1950, adhered to thereafter. The testimony is too vague and inconclusive to alter the weight of the overwhelming proof later detailed.

gun by sales of stumpage to paper mills, also being substantial purchasers, by virtue of contracts calling for payment on a per unit cut basis. *The gains on sales of lumber grade and pulpwood grade hardwood were reported at capital gains rates and such sales and tax treatment are not here in question.*[2] As the result of a cruise (survey) taken in 1959, which results were made known in 1960, it was estimated that there were 934,600,000 feet of hardwood of all grades in the Kirby forest, of which tie grade hardwood [tie timber] comprised 245,700,000 feet. From 1951 through 1959, a total of 162,893,750 board feet of tie grade hardwood timber was sold from plaintiff's lands. The number of feet sold in 1959 (10,650,282) equaled approximately $\frac{1}{25}$th (or 4%) of the total estimated tie grade hardwood stand then remaining.

"[8]. The market for tie grade hardwood was from 1951 through 1959 extremely limited. The number of persons then engaged in producing railroad ties, board road planks, etc., is unknown, but plaintiff had contracts only with fourteen in 1959. Those with whom plaintiff dealt through the period 1951–1959 were of extremely limited financial resources, and were, thus, unable to purchase large quantities of timber at any one time. This fact was known by plaintiff management and resulted in the decision to sell the tie grade stumpage by a cutting contract calling for advance payment rather than payment on a per unit cut basis, which would, in effect, be a credit sale. At no time did there exist, to plaintiff's knowledge, any buyer or buyers interested in and capable of buying all of the tie grade timber at one time, although if such a buyer or buyers had been forthcoming plaintiff would have disposed of such timber all at once.[3]

"[9]. During the tax year in question, 1959, plaintiff sold 10,650,282 feet of standing tie grade hardwood timber by virtue of 206 separate contracts with fourteen separate individuals, receiving a total of $122,454.45, less basis of $14,530.18, for a gain of $107,924.27. Of such sales, more than half, 117, were to only two persons. On an average the 206 sales involved 51,700 feet of timber on 144.73 acres, for a sale price of $595.55, or just over 1 cent per board foot. The 117 sales involved an average of about 48,700 feet, on an average 121.-94 acres for an average $445.59 per sale, or just under 1 cent per board foot. *In 1959 plaintiff received from the sale of lumber and other timber products a total of $9,217,484.32 of which 90.5% is attributable to pine products. The amount received in 1959 from the sale of tie grade hardwood stumpage under the contracts in question, $122,454.45 equals 1.3% of such total sales figure.* Total sales in this calculation did not include receipts on sales of capital assets, income entitled to capital gain treatment, income from rents and royalties, and other miscellaneous income not attributable to sales of manufactured products. *The income from the sales herein question is separate from the mainstream of the enterprise of plaintiff, is not the normal source of plaintiff's business income,* and are comprised of sums received in liquidation of standing tie grade hardwood. Plaintiff was in 1959 primarily engaged in the trade or business of manufactur-

2. Footnote by this Court:
   This is due to the provisions of § 631 of the Internal Revenue Code (1954).

3. Footnote by this Court:
   The Director says that this finding is "erroneous and misleading" because "[A] witness for the taxpayer testified that 10% of the timber grown in bottom land was tie grade and that bottom land would not be clear cut". We do not agree with this contention. The record shows that the taxpayer was selling logs [timber severed from the stump] and pulpwood from these lands in a manner not open to taxation controversy. When it comes to identifying and classifying the exact nature and purpose of a river bottom hardwood forest the ten percent tail cannot wag the ninety percent dog.

ing pine timber into lumber and other products for sale at wholesale.

"[10]. All of the hardwood timber in question had been held by plaintiff at the time of sale for a period of time in excess of six (6) months.

"[11]. Plaintiff maintained in 1959 two offices for the conduct of its business, the executive office in Houston, and the plant office at the mill in Silsbee. At the executive office are located the Sales, Tax, and Land & Forestry departments and a portion of the Accounting department together with the executive officers, including the Treasurer and the Secretary, in total numbering about forty-five persons. At Silsbee about 850 persons are employed as production employees, plant managers, logging superintendents, purchasing agents, accounting personnel, foresters and supervisors. *There was no separate department for the handling of hardwood timber. No portion of the time of the Sales department was devoted to sales of hardwood timber. Less than half of the time of one employee in the Land & Forestry department in the Houston office was involved with the administration of hardwood sales.* Only about 30% of the time of up to ten woods employees is involved with hardwood activity—locating and marking hardwood for cutting as an incident to the management of the pine and giving notice to known prospective purchasers that hardwood was marked and available for removal. There was no advertising promulgated or displayed or sales promotional activity engaged in by any employee of plaintiff. There were no improvements made to the property in question designed to entice a prospective purchaser to buy or to increase the sales price or value of the property, nor was tie grade hardwood timber listed with an agent or broker for sale. *The disposals of tie grade hardwood made in 1959 were but an incident of the development of the pine forest under the perpetual cut forestry management program, were pursuant to and consistent with the liquidation program begun in 1951 and continued through 1959, and were disposals as possible upon the only available market and consistent with its demand. The sales were incidental to the plaintiff's trade or business and were required for its economical and successful management.*

"[12]. The lands on which stood the tie grade hardwood timber sold in 1959 and of which land said timber was a part, and was, thus real property, were held by plaintiff for use in its trade or business. *The gain realized on such sales was not profit arising from the everyday operation of a business, but rather, represented the realization of appreciation in value of an asset held over a substantial period of time. It was not a part of the business of the taxpayer to buy and sell or trade in timberland or standing timber, be it pine or hardwood. Tie grade hardwood timber was properly carried on the books of plaintiff as a fixed asset and therefore was not stock in trade of the taxpayer or property properly includible in inventory, and, further, was not property held by the taxpayer for sale to customers in the ordinary course of its trade or business.*"

[End of Findings by District Court]

These findings, as in most cases, may provoke disagreement or criticism but they are amply supported by the record. We avoid the prolixity of reiterating the salient facts which point to a decision and which have hereinabove been indicated by special emphasis.

The taxpayer had never bought land or timber for resale. Pursuant to a well defined and undisputed policy, inaugurated years previously, in 1959 it manufactured no hardwood in any form. It manufactured pine lumber only. It sold hardwood logs of lumber grade to others. It sold pulpwood to paper mills. There is no taxation controversy as to these items. The entire litigation is centered solely and exclusively upon the lowly tie timber trees that can be utilized, if at all, only as railroad cross ties and the by-products of their manufacture. The only way to dispose of them, as random opportunity offered, was to

portable saw mill operators in small quantities per sale at about one cent a board foot. That operation was so marginal that prudence required payment by cash in advance. The hardwood in the pine lands was to be wholly eliminated, if at all possible. The bottom lands would not be cleared of hardwood but they represented only 15% of the total lands owned. Moreover, the tie timber on those lands represented 10% of the timber there situated.

As indicated by the cases cited at the beginning of this opinion, when the facts are settled in a capital gains-or-dinary income tax case the law is plain.

These tie timber trees, not severed from the stump or the earth, were realty, a fixed asset, a capital asset, see Carroll v. Commissioner of Internal Revenue, 5 Cir., 1934, 70 F.2d 806; United States v. Robinson, 5 Cir., 1942, 129 F. 2d 297.

█ Under the plain terms of § 1221 of the Internal Revenue Code (1954) a sale of such an asset is entitled to capital gains treatment unless it falls within one of the exceptions of § 1221(1), that is, inventory on hand at the close of the taxable year OR property held primarily for sale to customers in the ordinary course of the seller's trade or business.

Under the teachings of Malat v. Riddell, 383 U.S. 569, 86 S.Ct. 1030, 16 L. Ed.2d 102 (1966) that "primarily" means "of first importance" or "principally" we are convinced that these tie timber sales in 1959 did not fall within the second exception. Under the facts they are bound to have been purely incidental and not "primary".

█ Nor do we perceive any basis for saying that these trees, limited to the facts before us, could properly have been included in the inventory of the taxpayer at the end of the taxable year. Kirby was not and never had been in the business of buying standing timber for purpose of resale.

The Judgment of the District Court is Affirmed.

JOHN R. BROWN, Chief Judge (dissenting):

It would be a mistake for some future taxpayer,—or for that matter the ubiquitous tax gatherer—to read this opinion as classifying complicated, variable arrangements for disposal of some, but not all of the timber of one or more kinds on one or more tracts of land as either capital gain or ordinary income. This almost leads me to concur in Judge Coleman's fascinating opinion which reflects undoubtedly an experience-acquired familiarity with the timber industry—Texas or Mississippi. But I cannot escape the feeling that crediting fully, as the Court does, the findings of the Trial Judge, they reveal a regular sale of the tie timber in question over a long period of time to a great number of purchasers. The fact that the tie timber has little value or its disposition—whether capital gains or ordinary income—produces but 1% plus of the income of the corporate taxpayer is completely irrelevant.

For example finding [7] shows a sale from 1951 to 1959 of 162,893,750 B.F. of tie timber. The cruise in 1959 showed 245,700,000 B.F. of tie timber remaining. Consequently at the start of the "liquidation" program in 1951 there was at least 418,593,750 B.F. of tie timber. But in 1959 only 10,650,282 B. F. of tie timber was sold, constituting ¹⁄₂₅th (4%) of the 1959 stand (245,-700,000 B.F.). Thus it would take 24 years more to exhaust the timber, which meant a total span of 33 years (1951–59 equals 9 plus 24) to carry out this liquidation.

Although the tie timber had little value, represented a nuisance in forestry operations, and could be sold mostly only in small lots to a great number of operators of such a small time nature as to require cash sales, all of this shows that taxpayer was indeed engaged in the *busyness* of selling this timber to whomsoever it could dredge up on the best, even if poor, terms possible. If the land on which the particular trees cut were being sold, such a volume of small indi-

vidual sales over such a protracted—if not perpetual—period of time would surely mark the business—on any and all tests—as being the sale of property held in the course of business for sale to customers.

Reversing the familiar and sometime-wearied figure of the fruit of the tree, what would be true for the land must follow for the tree.

The tree falls into ordinary income so I respectfully dissent.