MARSHALL W. ENSLIN and LOIS T. ENSLIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Enslin v. Commissioner
Docket No. 9436-78.
United States Tax Court
T.C. Memo 1982-430; 1982 Tax Ct. Memo LEXIS 315; 44 T.C.M. (CCH) 616; T.C.M. (RIA) 82430; July 28, 1982. *316 Marshall W. Enslin, pro se. James Harbert, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in petitioners' Federal income tax in the amounts of $2,320 and $7,396 for the taxable years 1974 and 1975, respectively. The issue before the Court is whether petitioners are entitled to capital gains treatment for land that they have held for several years, when they later subdivide the land into 16 lots, construct 16 single-family homes thereon, and sell these improved lots to individual customers. Specifically, the issue is whether the land was "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" and thus not a "capital asset" within the meaning of section 1221. [1]
FINDINGS OF FACT Most of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners, husband *317 and wife, resided in Flossmoor, Illinois, at the time they filed their petition in this case. They filed joint Federal tax returns for 1974 and 1975 with the Internal Revenue Service Center at Kansas City, Missouri. Petitioner Lois T. Enslin is a party to this proceeding solely because she filed joint returns with her husband, and the term petitioner will hereinafter refer to Marshall W. Enslin. Petitioner has been in the construction business for many years. He has never had a real estate dealer's license or broker's license, has never had any office except his office in his home, and has never acted as a salesman for any real estate dealer. Petitioner's business operations are analogous to those of a general contractor and builder in that he acquires vacant land, [2] builds single-family residences on individual lots, and then resells the improved properties. During the years 1953 through 1965, he constructed and sold up to 12 homes per year, with average construction and sale of about eight homes per year. In each of the years 1962 and 1964, he also constructed an apartment building, and has continuously operated those buildings as rental properties since that time. *318 In February of 1966, petitioner purchased for a total cost of $28,000 two tracts of vacant land in Lansing, Illinois (hereinafter "the Lansing property"). At the time he acquired the Lansing property, petitioner intended to subdivide the two tracts into individual lots and build single-family residences on the individual lots. Soon after the Lansing property was acquired, he retained an engineer to draw up plans for the subdivision of the two tracts. However, in the spring of 1966, because of a "credit crunch" with mortgage money and because of generally adverse economic conditions, petitioner decided to discontinue his construction business. At that time, he sold all of the vacant lots he had previously acquired as home sites, except the Lansing property which he retained. Petitioner did not construct any homes during the years 1966 through 1970. Petitioner tried other lines of work, such as selling stocks, but with little success. During this period, his principal source of income was the rental income from his two apartment buildings. Late in 1970, the Village of Lansing, Illinois, informed petitioner that he had to install curbs, storm sewers, and sanitary sewers on the *319 Lansing property or else the Village would institute condemnation proceedings against a portion of the property for street rights of way and sewers and would levy special assessment taxes against the property for these improvements. In response to the demands made by the Village, petitioner had the required improvements made to the Lansing property during the years 1971 and 1972. The record does not indicate the costs of these improvements to the Lansing property. Deciding that building was the only business he really knew, petitioner returned to the construction business in 1971. During the years 1971, 1972, and 1973, he participated in a low-income housing program, whereby he purchased vacant lots in the area of Robbins, Illinois, and constructed homes upon them on a contract basis. In the period from 1971 through 1973, he built and sold 13 homes in that area. In 1973 petitioner retained an engineer to complete the plans that had been started seven years earlier for the subdivision of the Lansing property. The two tracts of land were divided into 16 individual lots of equal value. The record does not indicate the fair market value of the two tracts of land or of the individual *320 lots at that time. Petitioner did not have the land appraised at any time after he returned to the construction business. However, in the intervening years since 1966 the River Oaks Regional Shopping Center had been built less than two miles away from the Lansing property, and there had been a general increase in the value of land in the area. The total cost incurred by petitioner in subdividing the Lansing property and installing curbs, streets, and sewers was $24,850, with the result that petitioner's cost basis in the 16 lots was $52,850 [3] or $3,303 per lot. During each of the taxable years 1974 and 1975, petitioner built and sold four single-family residences on portions of the Lansing property. During the years 1976 and 1977, he built and sold eight additional residences, the last remaining unit being sold in June of 1977. Each house and lot sold in 1974 *321 brought an average price of at least $42,000 and those sold in 1975 brought an average price of at least $44,000. On Schedule C of his 1974 and 1975 Federal income tax returns, petitioner reported his sales of the homes on the Lansing property. Petitioner made an adjustment to the basis for each lot by increasing its cost of $3,303 by one-half of what petitioner considered to be the appreciation in the land for the period from the time he acquired the Lansing property in 1966 until the time the individual lot and house were sold to the buyer in 1974 or 1975. Petitioner made the following calculations: 1974
1975
(a) Fair market value of
each lot at time of sale
$7,303.00
$12,397.00
Average Cost/Lot
- 3,303.00
- 3,303.00
Appreciation in Value
$4,000.00
$ 9,094.00
(b) Average Cost/Lot
3,303.00
3,303.00
50% of Appreciation in value
+2,000.00
+4,547.00
Amount deducted on
return as Cost/Lot
$5,303.00
$ 7,850.00
Petitioner then used these adjusted basis figures for the lots in computing his cost of sales attributable to his sales of real estate each year. On audit, respondnt reduced the basis of each lot to $3,303, petitioner's actual cost *322 basis, and thereby reduced the cost of each sale by $2,000 in 1974 and by $4,547 in 1975. Respondent thus increased petitioner's ordinary income from the sales of the houses by $8,000 for 1974 and by $18,188 for 1975. OPINION Petitioner is in the business of building single-family homes. This case involves a tract of land, the Lansing property, that he had owned for a number of years and then subdivided into 16 lots, built 16 houses thereon, and sold to various customers. Petitioner frames the issue in terms of whether or not the appreciation in the value of land held by him over a period of eight years is capital gain or ordinary income. [4] Petitioner asks the Court to bifurcate each sale, giving capital gains treatment to the lot and ordinary income treatment to the house. He argues that the appreciation in the value of the land accrued over a substantial period of time and should be differentiated from the profits arising from the everyday operation of his construction business, what he calls the "bricks and mortar improvements, or houses." *323 The core issue here is whether the land was a "capital asset" held as an investment so as to give rise to capital gains rather than ordinary income. Sec. 1222. In defining the term "capital asset," section 1221(1) excludes from such definition "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." [5] Capital gains provisions being an exception to the normal tax rates, the term "capital asset" must be narrowly construed and the exclusions from that category, such as those in section 1221(1), must be broadly interpreted. Corn Products Co. v. Commissioner,350 U.S. 46, 52 (1955); Gartrell v. United States,619 F. 2d 1150, 1153 (6th Cir. 1980). The Supreme Court has explained the purposes of section 1221(1), stating in Malat v. Riddell,383 U.S. 569, 572 (1966) that: *324 The purpose of the statutory provision * * * is to differentiate between the "profits and losses arising from the everyday operation of a business" on the one hand ( Corn Products Co. v. Commissioner,350 U.S. 46, 52) and "the realization of appreciation in value accrued over a substantial period of time" on the other. ( Commissioner v. Gillette Motor Co.,364 U.S. 130, 134.) Petitioner relies on that language to support the bifurcated treatment he seeks. However, Malat v. Riddell,supra, involves property held for a dual purpose (either to develop for rental or to sell). In that context a court must decide for which purpose the property is "primarily" held, and the word "primarily" means "of first importance." The present case does not involve a dual purpose but a change in the purpose for which the land was held. As will be discussed later, this case actually involves two changes in the holding purpose. Subsequent to Malat v. Riddell,supra, this and other courts have had to deal with cases involving a change in the taxpayer's purpose in holding the land and the role of the taxpayer's prior *325 investment intent. Suburban Realty Co. v. United States,615 F. 2d 171 (5th Cir. 1980); Biedenharn Realty Co., Inc. v. United States,526 F. 2d 409 (5th Cir. 1976); Bynum v. Commissioner,46 T.C. 295, 298-299 (1966). [6] We certainly agree with the Fifth Circuit that prior investment intent is not always irrelevant; we also agree that "once an investment does not mean always an investment." Biedenharn v. Commissioner, 526 F. 2d at 421-422, 423. In our Bynum opinion decided the same year but shortly after the Supreme Court's ruling in Malat v. Riddell, we faced such a change-of-purpose situation. We were keenly aware that when there has been a change in holding purpose at some point, the transaction may well cut across both major purposes of section 1221(1), and any resulting gain on the transaction may well embrace both profits and losses from the everyday operation of a business and appreciation in value that has accrued over a period *326 of years. In his concurring opinion in Bynum (46 T.C. at 302), now Chief Judge Tannenwald, in language peculiarly apt here, highlighted the problem as follows: Unquestionably in many cases involving change of purpose, the profit is realized in two parts. One part is properly attributable to the appreciation in value during the period when the property was held for investment. The other part represents the fruits of the business. To tax all of such appreciation as ordinary income where the activity is turned into a business may inflict hardship on the taxpayer; contrariwise, to tax all of such appreciation at long-term capital gains may give the taxpayer an unjustifiable windfall. Perhaps some method of allocation within an appropriate statutory framework is indicated. See Surrey and Warren, Cases on Federal Income Taxation 695-696 (1960). Unfortunately for petitioner, "an appropriate statutory frame-work" that might permit some method of allocation is still non-existent. The Congress has not seen fit to provide a statutory basis for an allocation such as petitioner *327 seeks, and we are not free to fashion a relief provision for him. We must apply the law as we find it. As shown by the Suburban Realty case decided some 14 years after Bynum, the courts are still grappling with this problem of characterizing the gain and must do so on the basis of the facts of each case and with only the language of the capital gains provisions for our legal guidance. 615 F. 2d at 173. We have found no case in which a court has held that a taxpayer is legally entitled to the bifurcated treatment that petitioner seeks. [7] The two principal cases petitioner relies upon are inapposite. Other cases cited by petitioner involve what has been called the "liquidation niche," but on the facts in this case petitioner cannot be regarded as an investor merely liquidating a prior investment. *328 Petitioner principally relies upon Turner v. Commissioner,540 F. 2d 1249 (4th Cir. 1976), rev'g. a Memorandum Opinion of this Court, and Temple v. United States,229 F. Supp. 687 (S.D. Miss. 1964), affd. 355 F. 2d 67 (5th Cir. 1966). Turner is clearly distinguishable on its facts. There the taxpayer, who had held the land for investment for a number of years, sold the land to a corporation and the corporation then developed the land. The Temple case requires somewhat more discussion. While the bottom-line result of the District Court's opinion was that the taxpayer was allowed capital gains in regard to the land and ordinary income in regard to the houses constructed thereon, the opinion did not focus on the issue we must decide in this case. The District Court simply found as an ultimate fact that the taxpayer, who was in the roofing and supply business, did not hold the land primarily for sale to customers in the ordinary course of his trade or business. On appeal, the Fifth Circuit simply said the matter was a question of fact and that the facts as found were not clearly erroneous. The Fifth Circuit affirmed on *329 that narrow basis, but with a vigorous dissent by Judge Wisdom who viewed the District Court's opinion as "egregiously erroneous." 355 F. 2d at 68. Whatever vitality, if any, the lower court's opinion in Temple ever possessed for the proposition for which petitioner cites it, that opinion has been explained in subsequent cases in the Fifth Circuit. Suburban Realty Co. v. United States,615 F. 2d at 180; Biedenharn Realty Co., Inc. v. United States,526 F. 2d at 420-421. In Biedenharn Realty, the Fifth Circuit, en banc, addressed the troublesome problem of a change in holding purpose from investment to active conduct of a real estate business, and seemed to relegate Temple to the category of an investor merely liquidating a prior investment. 526 F. 2d at 420-421. The Biedenharn opinion thoroughly explored this narrow "liquidation niche" that permits an investor to subdivide his land and add some improvements to make it marketable without losing his investor status and without becoming a real estate dealer. 526 F. 2d at 417, 421-422. This Court too has recently cited Temple for such *330 a proposition, characterizing it as a case where the taxpayer "merely subdivided the land in order to make it more marketable and enhance its value." Buono v. Commissioner,74 T.C. 187, 204, n. 23 (1980). On the facts in Buono, we found that the taxpayer was not a dealer but merely an investor liquidating his prior investment. [8] That, however, is a far cry from saying that merely because the taxpayer once had an investment purpose, that he can go into business building houses on his subdivided land and still retain the capital gains treatment for the land portion when he ultimately sells the lot and the house to a customer. Since petitioner tries to fit his situation within the "liquidation niche" cases, we must discuss the facts of his case in somewhat more detail. It is undisputed that when petitioner purchased the Lansing property in 1966, he intended to subdivide the land and build single-family residences on the individual lots. At that time he retained an engineer to draw up plans for the subdivision. It could hardly be denied that in 1966 the land was "held by *331 the taxpayer primarily for sale to customers in the ordinary course of his trade or business," and we do not understand petitioner to suggest otherwise. [9] However, petitioner's plans changed because of the economic slump in the construction business at that time. Petitioner went out of the construction business. At that time he sold all of the lots he owned, and retained only the Lansing property. Petitioner then held the Lansing property for a number of years. During those years the Lansing property appears to have been a capital asset and had he sold it during that period, he may well have been entitled to capital gains treatment. We do not understand respondent to suggest otherwise. However, that did not occur. *332 Then came another change in holding purpose, a change occurring before 1974, the first year before the Court.However, the exact time of this second change is perhaps not without dispute. In 1971 petitioner returned to the construction business. Petitioner calls himself a "scattered lot builder," suggesting that he built houses only upon scattered individual lots. See footnotes 2 and 9. It is clear that he did not immediately start building houses on the Lansing property. Instead he engaged in business in the Robbins, Illinois area, constructing low-income housing. The only thing petitioner did in regard to the Lansing property was to install certain curbs, storm sewers, and sanitary sewers that the Village of Lansing required him to install. Those required improvements were installed in 1971 and 1972. The Court is not prepared to say that petitioner's purpose for holding the Lansing property had necessarily changed by 1971 and 1972, in spite of the fact that he had gone back into the building business. Although petitioner was again engaged in the building business in regard to the low-income housing, conceivably he could have continued to hold the Lansing tract for investment *333 purposes during that period. Maddux Construction Co. v. Commissioner,54 T.C. 1278, 1284 (1970). Petitioner, however, stresses the improvements to the Lansing property mandated by the Village of Lansing, arguing that such improvements were forced upon him and should have no bearing on the purpose for which he held the land. Petitioner says it was thus impossible for him to sell "unimproved" land, but this case does not involve just those improvements. Petitioner virtually ignores the fact that he later built houses on the lots. If this case merely involved the improvements by way of curbs, storm sewers, and sanitary sewers that the Village of Lansing forced petitioner to install in 1971 and 1972, and had petitioner sold the tract of land with just those improvements, this case might well fall within the "liquidation niche" cases. Buono v. Commissioner,supra.[10] We cannot find as we did in that case that petitioner is an investor who "merely subdivided the land in order to make it more marketable and enhance its value." 74 T.C. at 204. [11]
*334 Petitioner was in the business of constructing single-family homes in 1973 when he either resumed or began his subdivision plans for the Lansing tract of land. In 1974 when he was actively building houses on the subdivided lots and selling them, the Lansing property was held by him "primarily" for sale to his customers in the ordinary course of his trade or business. As the Fifth Circuit noted in Biedenharn Realty, "However wide the capital gains passageway through which a subdivider with former investment intent could squeeze, [petitioner] will never fit." 526 F. 2d at 422. It may seem harsh to petitioner that the appreciation in the value of the land that accrued over a period of years should be deprived of the benefits of capital gains treatment. While there may be logic and equity in petitioner's argument, there is no statutory provision that permits us to make such an allocation.That fact of judicial life has not changed in the years since our Bynum opinion. Undercutting both the logic and equity of petitioner's argument, however, is the factr that he seeks capital gains on appreciation that occurred after he undeniably was engaged in the business *335 of building houses on the Lansing tract. He claims not just appreciation from 1966 through 1971, or 1973, whichever date might better be regarded as the date his business activities in regard to this land clearly supplanted his prior investment intent.[12] For 1974 petitioner claims that each lot had appreciated by at least $4,000 and for 1975 by $9,094. This may well be the situation we envisioned in Bynum where it could be said that "to tax all of such appreciation as long-term capital gains may give the taxpayer an unjustifiable windfall." 46 T.C. at 302. To hold for petitioner would require us to either rewrite or ignore the tax laws, which we cannot do. We must sustain respondent's determination. Decision will be entered for respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years involved in this case, unless otherwise indicated.↩
2. On brief petitioner unilaterally tries "to amend" the parties' stipulation to suggest that except for the one tract of land involved in this case (the Lansing property) he always acquired only "scattered lots." The record is devoid of any evidence as to whether lots he acquired were contiguous, "scattered," or otherwise. However, as will be discussed later, we think such a fact, even if established by petitioner, would not change the result in this case.↩
3. This figure represents the original purchase price of $28,000, plus the $24,850 for improvements. Of the $24,850, the record does not show how much petitioner spent for the improvements ordered by the Village of Lansing in 1971 and 1972, and how much he spent in 1973 after resuming his subdivision activities.↩
4. Petitioner did not claim capital gains treatment on his tax return. Instead, on the Schedule C to his tax return, petitioner increased his basis in the individual lots so as to increase his cost of sales and decrease his gain on the sales. Petitioner increased his basis in each lot by one-half of what he deemed to be the appreciation in the value of the land from the time he acquired the Lansing property in 1966 until he sold each individual subdivided lot and house built thereon.↩
5. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include-- (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;↩
6. See also Gibson v. Commissioner,T.C. Memo. 1981-240↩.
7. In at least one case where a taxpayer clearly articulated his claim for such bifurcated treatment, we refused to permit it. See Gibson v. Commissioner,T.C. Memo. 1981-240↩.While the land in that case was originally received as a gift rather than by purchase, that is irrelevant. The land was initially held by the taxpayer as pasture land. Later the purpose changed. The taxpayer later subdivided the land and began residential development of the property. We concluded that the lots were held primarily for sale to customers in the taxpayer's construction business, and that the gain on the lots as well as on the houses was ordinary income.
8. See also Planned Communities, Inc. v. Commissioner,↩ T.C. Momo. 1980-555.
9. On brief, petitioner tries to characterize his other house-building activities (before 1966 and again from 1971-1973) as being a "home builder on scattered lots," apparently as opposed to being a home builder on contiguous lots in a subdivision. We think this is a distinction without a difference. Petitioner may be making the point that this was his first subdivision effort but, if so, that fact is irrelevant and immaterial. The purchase of a large tract of land and subdividing and building houses on the lots in that subdivision is clearly a trade or business. That was the business for which petitioner acquired and held the Lansing property in 1966 and it was the business to which he returned no later than 1973. Even if petitioner is arguing that he had not really commenced the subdivision work in 1966, that would not change the outcome in this case, since he clearly entered into such a trade or business no later than 1973 when he resumed his subdivision plans for the Lansing property.↩
10. See also Planned Communities, Inc. v. Commissioner,T.C. Memo. 1980-555↩. 11. Apparently petitioner does not seek to bring himself within section 1237 involving real property subdivided for sale, nor could he in view of his prior holding of the Lansing property in his business in 1966 (sec. 1237(a)(1)) and more importantly, in view of his substantial improvements to the land, particularly the construction of houses thereon (sec. 1237(a)(2)). Pointer v. Commissioner,48 T.C. 906 (1967), affd. 419 F. 2d 213, 216 (9th Cir. 1969); secs. 1.1237-1(a)(5) and 1.1237-1(c)(4), Income Tax Regs. See also Gibson v. Commissioner,T.C. Memo. 1981-240↩ on the section 1237 argument.
12. We need not and do not decide on exactly which date this occurred. It had clearly occurred by 1974, the first taxable year before the Court.↩