**W. C. WOOD and Altamae Wood, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 17651.

United States Court of Appeals
Fifth Circuit.

April 11, 1960.

---

Robert J. Hobby, Wentworth, T. Durant, Dallas, Tex., for appellant.

Charles K. Rice, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., Arch M. Cantrall, Chief Counsel, I.R.S., Washington, D. C., John M. Morawski, Sp. Atty., I.R.S., Washington, D. C., Lee A. Jackson, Robert N. Anderson, Melva M. Graney, Attys., Dept. of Justice, Washington, D. C., Howard A. Heffron, Acting Asst. Atty. Gen., Davis W. Morton, Jr., Atty., Department of Justice, Washington, D. C., for appellee.

Before HUTCHESON, JONES and WISDOM, Circuit Judges.

JONES, Circuit Judge.

The petitioners seek review of a decision of the Tax Court holding the proceeds of certain real estate sold during the years 1948 through 1953 to be taxable as ordinary income rather than as capital gains. This decision followed a determination that the sales involved were of property held primarily for sale to customers in the ordinary course of petitioner's trade or business. Petitioners attack this determination and contend that the proceeds should be treated as capital gains under sections 117(a) and (j) of the Internal Revenue Code of 1939. 26 U.S.C.A. (I.R.C.1939) § 117. Mrs. Wood is a party because of the filing of a joint income tax return with her

husband. The record shows that she took no part in the transactions and therefore by any reference to the taxpayer we shall mean Mr. Wood.

The taxpayer is a resident of Lubbock, Texas. Early in 1945, after being in the printing business for twenty years, his doctors advised him to get out of business for reasons of health. This he did promptly, selling his business and his residence. He and his wife moved to a hotel. Wood had been active in religious pursuits for many years and, upon selling his business, he announced it to be his intention to devote the rest of his life to religious endeavors. He invested the proceeds from the sale of his business in Government bonds. In October of 1945, he was telling one of his long-time friends, an investment counsellor, of the sale of his business and the investment of the proceeds. The friend suggested that Government bonds afforded no protection against inflation and recommended that at least a part of his investment should be in common stocks or real estate. Following the suggestion of his friend, Wood decided to take his money out of the Governments and invest it in real estate strategically located on the outskirts of Lubbock. In a letter to his bookkeeper, Wood declared his intention to hold these properties and derive income from them during his life and leave them to his wife. Like statements were made to others. About this time Wood rented an office on the door of which was the caption "William C. Wood, Investments." His telephone listing was under "Listed Investments." He was not licensed as a real estate broker and did not act for others in real estate transactions unless his activity with respect to the Wood-lawn subdivision, which is hereafter discussed, could be so designated.

Wood's first venture into real estate ownership was the purchase in November of 1945, of the so-called Merrill tract. The purchase price was $40,000, of which half was paid in cash and the balance was represented by promissory notes. This land was on the outskirts of Lubbock. Railroad trackage ran along the length of the property. The tract had been platted and the lots had been listed for sale with several real estate brokers by those from whom the taxpayer bought it. The taxpayer removed an old building and did other clearing. He arranged for additional trackage. He cancelled the listings of the lots in the tract which had been made by his predecessors in title. Wood had the land replatted into odd-shaped lots of different sizes with each lot having railway trackage. These things being done, the taxpayer was ready to enter into long-term leases of the several lots to tenants needing sites for industrial purposes.

Of a similar character was the so-called Nelson-Brown Addition. This too was a subdivision in a section of Lubbock suitable for industrial development. By three separate purchases, in April, 1947, January, 1950, and October, 1951, Wood acquired most of the subdivision. At his own expense, Wood arranged for railroad trackage to be brought into the property, As in the case of the Merrill tract the taxpayer did not acquire the Nelson-Brown land for the purpose of selling it. He intended to make long-term leases and, to this end, he asked Cox and Murfee to find tenants.

The efforts made to make leases on the land in the two tracts were quite extensive and intensive. A brochure was prepared to show the attractive features of the properties as industrial sites, in which it was asserted that attractive leases could be arranged. The brochure stated, "Properties Shown are Not for Sale." The brochure was widely distributed. Interest was developed by the brochures and otherwise. One lease was made. It contained an option to purchase which was subsequently exercised. Most of those who were interested were unwilling to make leases, usually because of the necessity of having fee ownership in order to finance the construction of improvements. Wood was unwilling to erect any improvements on the property, because he could have done so only with borrowed capital, and it was his desire

to leave the property to his wife without encumbrance. When some of the interested prospects were unwilling to enter into leases but offered to buy sites, these offers were submitted by Cox or Murfee to Wood and, from time to time sales were made. During the years involved in this proceeding seven sales were made of land in the Merrill tract; two in 1949, two in 1950, and three in 1951. No sales were made in 1948, 1952 or 1953. Sales of land in the Nelson-Brown tract followed pretty much the same pattern. Two sales were made in each of the years 1949, 1950, 1951 and 1953; none in 1948 or 1952. During the period the activity was directed toward not making sales but to the making of leases. As the Tax Court pointed out in its opinion:

"Wood believed that he could lease Nelson-Brown and Merrill as industrial properties when he made his original investments in those properties. He attempted to promote the city of Lubbock, through Chamber of Commerce activities. He was made president of the local chamber in 1950 and also worked for four years in a special group of the chamber designed to promote the city. He believed that the Chamber of Commerce could attract firms to Lubbock that would lease properties."

Although Cox became convinced that the likelihood of obtaining lessees in substantial numbers was remote, he was unable to convince Wood that this was so. Throughout all of the tax years and to and at the time of the trial before the Tax Court Wood believed that these properties could be leased for industrial purposes. The Tax Court concluded that while these properties were offered for lease, and not for sale, the taxpayer was willing to have them sold, and the properties were for sale in fact. The gains made on the sales from these two tracts were determined to be ordinary income.

Early in 1946 Wood bought an 80-acre tract just west of the Lubbock city limits. This land was then planted in cotton but Wood believed that eventually it would be good property. Wood promised Murfee the exclusive selling rights if the property was put on the market. Prior to this purchase the taxpayer had agreed to sell each of four friends ten acres in the east half of the tract purchased. He agreed with his friends that he would not market his land until theirs had been sold. With one of them, T. E. Buckner, the taxpayer agreed to repurchase any part of his parcel remaining unsold at any time. His associates desired to sell their lands as soon as possible and, upon their insistence, Wood agreed to the subdividing, platting and dedication of the entire eighty acres. The subdivision was called Woodlawn. The lots of the others moved slowly, due in part to the absence of utilities. In August of 1946 Buckner, with about three-fourths of his ten acres unsold, called upon Wood to repurchase it. To effect this repurchase Wood was required to borrow from his bank.

In February of 1947 the taxpayer was informed that the Lubbock School District would put a school on the west side of Woodlawn. He sold the school district seven and a half acres. Water, sewer and electric lines were then extended throughout Woodlawn.

Needing funds to repay the bank the money borrowed for the repurchase of the Buckner lots, Wood authorized Murfee to sell these lots and they were disposed of before the last of August, 1947. The lots of the others in the east half of the subdivision had been sold and there was a demand for those of the taxpayer. Without the knowledge of Wood, his lots in Woodlawn were advertised for sale by Murfee. Although he did not personally participate in any sales activity, the taxpayer realized that the subdivision had reached the near maximum of its development potential and he acquiesced, without objection, in the sales arranged by Murfee and did what was required of him in the closing of sales. In the last half of 1947 there were 19 sales of Woodlawn lots, in 1948 there were 47 such sales, in 1949 eight sales

were effected, and in the first half of 1950 seven sales exhausted the taxpayer's Woodlawn property. Such of these lots as were sold during the tax years of 1948 through 1950 were found by the Tax Court to have been held primarily for sale to customers in the ordinary course of the taxpayer's trade or business.

The taxpayer contends that both the industrial and residential properties were capital assets, and the profits from the sales of these properties were capital gains, subject to federal income taxation as such rather than as ordinary income as held by the Tax Court.

This Court, on former occasions, has considered and discussed all of the questions presented here. See, e. g., Galena Oaks Corp. v. Scofield, 5 Cir., 1954, 218 F.2d 217; Goldberg v. Commissioner, 5 Cir., 1955, 223 F.2d 709; Smith v. Dunn, 5 Cir., 1955, 224 F.2d 353; Ross v. Commissioner, 5 Cir., 1955, 227 F.2d 265; Consolidated Naval Stores Co. v. Fahs, 5 Cir., 1955, 227 F.2d 923; Smith v. Commissioner, 5 Cir., 1956, 232 F.2d 142; Barrios' Estate v. Commissioner, 5 Cir., 1959, 265 F.2d 517. Repetition would serve no useful purpose. We therefore consider this case in the light of the established tests and, in so doing, we find ourselves in agreement with the conclusion of the Tax Court with respect to the residential or Woodlawn tract. The Tax Court did not separately consider the residential and the industrial property. We think it is necessary to do so.

■■ The residential tract, or that portion of it retained or reacquired by the taxpayer, was purchased for the purpose of ultimate resale after an enhancement in value. That enhancement was fully realized soon after the school was erected in the subdivison. Wood financed and supervised the platting and subdividing of the tract. He acquiesced in the sales promotion and advertising by the agent. Over the period of thirty-five months, eighty-one sales were made with the result that all of the taxpayer's lots in Woodlawn were disposed of. We

are aware of the decisions holding that various factors here present did not require a determination that property was held primarily for sale to customers in the ordinary course of trade or business. But each case must be decided on its own peculiar facts. Smith v. Dunn, supra. Specific factors, or combinations of them are not necessarily controlling. Smith v. Commissioner, supra. The Tax Court's holding as to the Woodlawn property is correct and is affirmed.

■ There was a very considerable difference in the taxpayer's purposes and activity with respect to the industrial Merrill and Nelson-Brown properties on the one hand, and the residential Woodlawn development on the other. These differences, we think, require a different treatment, for tax purposes, of the profits resulting from sales. The Tax Court reached the conclusion that, "The industrial lots were not held for leasing in the ordinary course of business and do not qualify as property within the ambit of Section 117(j), and we do not understand the petitioner to contend otherwise." The contrary is vigorously asserted and we think is maintained. We do not think there is substantial evidence to support the Tax Court's finding. The industrial sites were purchased for leasing and there was never any departure or deviation from this intention as the primary purpose. Sales were made to get funds to make payments on the property, and sales were made of some lots in order that the remainder might be made attractive to prospective tenants. These sales were in furtherance of Wood's primary purpose of leasing these tracts. It may be that this purpose was difficult, or perhaps impossible, of accomplishment, but nevertheless it was a purpose in which Wood was sincere and steadfast. It is our decision that he was entitled to capital gains treatment on the profits realized from the sales of the industrial sites.

■ It will not be questioned that a property owner may hold some of it for sale to customers in the ordinary course of business and hold the remainder as

capital assets. See Foran v. Commissioner, 5 Cir., 1948, 165 F.2d 705; Wood v. Commissioner, 5 Cir., 1952, 197 F.2d 859.

The decision of the Tax Court is affirmed in part and reversed in part, and the case is remanded for further proceedings in accordance with this opinion.