M. Pickett **MYERS**, III, and Elizabeth Myers, Plaintiffs,

v.

**UNITED STATES** of America, Defendant.

No. GC 70–72.

United States District Court, N. D. Mississippi, Greenville Division.

May 17, 1972.

C. S. Tindall of Lake, Tindall & Hunger, Greenville, Miss., Pascal J. Townsend, Jr., of Townsend, Welch & Terney, Drew, Miss., for plaintiffs.

H. M. Ray, U. S. Atty., William M. Dye, Jr., Asst. U. S. Atty., Oxford, Miss., for defendant.

## MEMORANDUM OF DECISION

ORMA R. SMITH, District Judge.

This action was tried to the court without a jury at the United States Courthouse in Clarksdale, Mississippi. At the conclusion of the trial on September 24, 1971, the court took the action under advisement and requested briefs from the parties. After a consideration of the pleadings, the evidence introduced at the trial, and the briefs submitted by counsel, the court makes its findings of fact and conclusions of law as embodied in the Memorandum of Decision which follows.

This action involves a tax refund suit brought by M. Pickett Myers, III and Elizabeth Myers for the refund of income taxes for the calendar years 1962 and 1963. Elizabeth Myers is a plaintiff in the action because she executed the returns as Myers' wife. All transactions involved in the action were those of Myers. Elizabeth Myers was not, in any way connected with them. The court will, therefore, treat the action, as one in which only Myers is concerned.[1]

1. The statutes involved in the action are: Internal Revenue Code of 1954 (26 U.S.C.):

"SEC. 167. Depreciation.

(a) General rule.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, or

(2) of property held for the production of income.

.　　.　　.　　.　　.

Three issues are involved. The first and paramount issue is whether the profits on several land transactions in which Myers was interested were derived from the sale of capital assets, and accordingly, taxable as capital gains; or from the sale of property acquired and held for sale in the ordinary course of business, and, therefore, taxable as ordinary income. The second issue involves the holding period of one of the tracts of land involved in the action. The third concerns a claim for depreciation allowances on property alleged to have been held by Myers for the production of income.

Transactions giving rise to this action concern the sale of capital stock in three Mississippi corporations organized by Myers and others for the purpose of taking title to three farms in the Mississippi Delta, namely, (1) Levee View Farms, Inc., incorporated January 12, 1961, (2) M. R. M. Plantation, Inc., incorporated July 18, 1961, and (3) Switch-Cane Farms, Inc., incorporated November 13, 1961.

Involved, also, are transactions concerning the sale or transfer of undivided interests owned by Myers in two other Mississippi farms, one known as the "Rich Place" and the other the "Ingram Place". The depreciation issue involves improvements on the "Townsend Place" situated in the State of Arkansas.

The contested issues of fact and law are succinctly stated in the pre-trial order and are:

a) As to M. R. M. Plantation, Inc., whether the stock owned by Myers therein was held for six months.

b) Whether or not the stock acquired and held by Myers in Levee View Farms, Inc., M. R. M. Plantation, Inc. and Switch-Cane Farms, Inc., and the undivided interest which he acquired in the lands known as the "Ingram Place" in Washington County, Mississippi, the "Rich Place" in Washington County, Mississippi, and the "Townsend Place" in Chicot County, Arkansas, were acquired and held by him for investment and farming purposes, as he contends, or, whether the stocks or interests in lands were acquired and held by him for sale in the ordinary course of business.

In the action sub judice the court must emerge with a solution to the "old, familiar, recurring, vexing and ofttimes elusive problem" described by Chief Judge Brown, of the Fifth Circuit in Thompson v. Commissioner of Internal Revenue (1963), 322 F.2d 122, concerning capital gains versus ordinary income arising out of transactions concerning the sale and transfer of real property.

Myers is fifty-four years of age and has become quite an expert with regard to property situated along the Mississippi River in Mississippi, Arkansas and Louisiana. During World War II Myers was the commanding officer of a destroyer. He was discharged from the Navy as a Commander in December 1945. Myers studied agriculture in college and did some graduate work in turbo-electric engineering.

At one time he was a licensed surveyor. After his discharge from the Navy Myers purchased a 614 acre farm, near Tunica, Mississippi and worked the land

SEC. 1221. Capital asset defined.
For purposes of this subtitle, the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—
(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

SEC. 1222. Other terms relating to capital gains and losses.
For purposes of this subtitle—
(3) *Long-term capital gain.*—The term 'long-term capital gain' means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income.
. . . . . . ."

for one year before accepting a position with Prudential Insurance Company of America (Prudential), as field representative primarily to make farm loans on farm land situated in the Delta portions of Mississippi, Arkansas and Louisiana. Myers held this position with Prudential for about fifteen years, or until mid-1961, when he resigned to enter into business for himself.

During the period of his employment with Prudential Myers received extensive training and experience in making appraisals of farm properties, as well as residential and commercial properties. The loans recommended by him were, for the most part, accepted by Prudential. Myers superiors at Prudential held him in high regard and had great respect for his judgment in such matters. Annually Prudential closed from three to six million dollars in farm loans recommended by Myers.

When Myers resigned his position with Prudential in 1961, he entered business on his own account as a farmer and dealer in farm properties. Myers continued to work for Prudential as a finder of loans. For this work he was paid a finder's fee consisting of a small percent of the loan.

Myers held on to the Tunica County farm, purchased by him upon his discharge from the Navy, while he was employed by Prudential, and still owns and operates this farm.

In 1961 Myers acquired other land and at the close of the year he was farming approximately 2,084 acres of land. He increased his holdings in 1962 and 1963 so that at the end of 1963 he was farming approximately 3,764 acres. Since that time his holdings have increased so that as of June 1, 1971 Myers was engaged in farming 6,028 acres of Delta land.

Myers has been extremely active in the purchase and sale of land since he left Prudential. He does not have a real estate broker's license, nor an established office or place of business from which he conducts a real estate business.

Myers conducts his farm operations and sales activities with regard to farm land from his home where space has been set aside for that purpose.

To prove the extent of Myers' activities as a dealer in real estate during the years 1961 through June 1971 the government introduced photo copies of ninety-one documents evidencing real estate transactions to which Myers had been a party during these years. The transactions evidenced by these documents involved farms situated in several Mississippi counties and two counties in Missouri. By counties these transactions were divided as follows: Twenty-one in Washington County, eighteen in Sunflower County, one in DeSoto County, two in Tunica County, twenty-seven in Bolivar County, five in Coahoma County, two in Tallahatchie County, two in Issaquena County, all in the State of Mississippi; one in Mississippi County, Missouri and twelve in New Madrid County, Missouri. Approximately one-third of these transactions occurred in 1962 and 1963, the tax years involved in this action.

Contending that the documents mentioned above introduced into evidence by the Government do not present a true picture of his activities during the period in question because in some instances two or more documents relate to the same transaction while others pertain to transactions in which he was not a true party in interest, and still others represent transfers of interests, between partners, Myers has introduced evidence that the ninety-one documents represent only thirty-five separate transactions, which are grouped timewise as follows: Three in 1961, six in 1962, nine in 1963, five in 1964, four in 1965, one in each of the years 1966, 1967, 1969, 1970 and 1971, and three in 1968.

A schedule prepared by Myers' certified public accountant lists land transactions accounted for by Myers in his tax returns for the years 1961 through 1970. The schedule shows the tax treatment given by Myers to each transaction for

the years 1961 through 1966 and that given in the agreement made by the parties during auditing proceedings.[2]

The following schedule reflects a summary of the transactions shown on Exhibit 45.

| Year | No. Trans- actions | Total Purchases | Total Sales | Total Gross Profits | Total Myers Share |
|------|------|------|------|------|------|
| 1961 | 3 | $ 311,000 | $ 350,900 | $ 38,354 | $ 21,720 |
| 1962 | 7 | 1,565,747 | 1,913,667 | 334,237 | 167,118 |
| 1963 | 16 | 2,488,275 | 2,984,876 | 552,135 | 221,542 |
| 1964 | 15 | 1,382,391 | 1,668,336 | 281,657 | 122,894 |
| 1965 | 5 | 710,879 | 1,050,167 | 339,102 | 283,749 |
| 1966 | 2 | 1,547 | 15,036 | 13,421 | 13,421 |
| 1967 | 1 | 305,915 | 366,653 | 60,738 | 60,738 |
| 1968 | 7 | 1,859,358 | 1,891,210 | 16,007 | (5,362) |
| 1969 | 2 | 265,996 | 384,464 | 120,124 | 120,264 |
| 1970 | 3 | 2,041,022 | 1,901,813 | (139,210) | (31,228) |
| Totals | 61 | $10,932,130 | $12,527,122 | $1,616,565 | $974,856 |

The sixty-one transactions shown in Exhibit 45 which have been summarized above, were characterized and divided by the accountant, as follows:

| Kind of Transactions | Number |
|------|------|
| 1) Sale of land | 36 |
| 2) Sale of property acquired in trade | 6 |
| 3) Sale of stock | 8 |
| 4) Exchange of land | 2 |
| 5) Sale of lots from Golden land | 5 |
| 6) Liquidation of Corporation | 2 |
| 7) Sale of property acquired in Corporation liquidation | 1 |
| 8) Sale of House | 1 |
| Total | 61 |

Myers was not the only person interested in the sixty-one transactions listed on Exhibit 45. Myers had partners in thirty-eight of the sixty-one transactions. Thirty-three of the transactions involve sales of farm land on an installment payment plan, thus enabling Myers to spread the profits derived from such sales over a period of years on his individual tax returns.

The Commissioner checked the returns made by Myers and the several partnerships in which he was interested for the calendar years 1962 and 1963. Three of the seven 1962 transactions shown on Exhibit 45 were treated by Myers on his return as short term capital gains (STCG) from the sale of capital assets. The agreement reached by the parties during audit proceedings (audit) treated these transactions as constituting sales in the ordinary course of business (ordinary income). Three of the sales were treated by Myers as long term capital gains (LTCG), and on audit they were treated as ordinary income items. The seventh was not reported on the 1962 return and the audit treated the profits from the sale as ordinary income. Ten of the sixteen 1963 items shown on Exhibit 45 were shown on Myers' individual return as ordinary income items. The other six were shown to be LTCG items. The audit agreement changed the status of four of the latter items to ordinary income items.

Pursuant to the agreement made by Myers and the Government during the audit proceedings, Myers paid the taxes assessed against him as the result of the closing agreement.

Myers does not question the entire assessment, but, only that part thereof which relates to the transactions which are involved in this action, to which reference has been hereinbefore made.

2. See Exhibit 45. This schedule contains the tax treatment given by Myers to land transactions for the years 1967–70. Since the Government has not audited the returns for that period the list omits, as a matter of course, any tax treatment attributed to the transactions as the result of an agreement made during auditing proceedings.

An examination of the tax returns made by Myers and the partnerships in which he held an interest for the calendar years 1962 and 1963, reveal that the major portion of Myers' income for these years was derived from activities relating to the purchase and sale of farm land. While Myers' 1962 tax return is silent as to Myers' occupation during the year, his return for 1963 (initial and amended return) describes his occupation as "Real Estate Dealer". The 1962 partnership returns received in evidence describe the principal business activity of the partnership as "Farm Land Rent", or "Farm Rental". The 1963 partnership returns describe the principal activity of the partnership as "Real Estate Oprs", or "Leasing Rent Property" or "Real Estate Dealer". The principal product or service is described as "Farm Land" or "Farm Rentals" or "Sale of Farm Land".

The record in this action is voluminous and the court has not attempted to discuss all of the facts in evidence which relate to issue of the principal business or occupation of Myers during the period pertinent to the action. A discussion of all relevant facts would unduly lengthen this memorandum. Suffice to say the court concludes from all the evidence that during the years 1962 and 1963 Myers' principal occupation or business was that of a dealer or trader in farm land. It is true that Myers farmed land which he owned and leased some of his land to others during the years in question and also earned substantial commissions or finder's fees from Prudential and other lenders, but the main or principal source of his income came from buying and selling farm land.

■ Myers contends, however, that even though he may be a dealer or trader in farm lands, this does not deprive him of the right to acquire farm land and hold it as a capital asset for investment and farming purposes. It is clear that a taxpayer, even though a dealer or trader in farm land, may hold some tracts of land primarily for sale to customers in the ordinary course of his trade or business, and other tracts as capital assets for investment purposes. Municipal Bond Corporation v. Commissioner of Internal Revenue, 341 F.2d 683, 689–690 (8th Cir. 1965); Margolis v. Commissioner of Internal Revenue, 337 F.2d 1001, 1003–1004 (9th Cir. 1964); Wood v. Commissioner of Internal Revenue, 276 F.2d 586, 590–591 (5th Cir. 1960); 3B Mertens, Law of Federal Income Taxation Section 22,139 (1958). The Fifth Circuit said in *Wood*, supra, 276 F.2d at 590–591 that "It will not be questioned that a property owner may hold some of it for sale to customers in the ordinary course of business and hold the remainder as capital assets". It is, therefore, incumbent upon the court to determine on a tract by tract basis whether Myers held his interest in the property *primarily* for sale to customers in the ordinary course of his trade or business or, whether he acquired and held it for investment purposes. The Supreme Court in Malat v. Riddell, 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966), where the court had under consideration the effect of the word "primarily" as used in the statute with regard to property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, said, "We hold that, as used in § 1221(1), 'primarily' means 'of first importance' or 'principally.'" 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102. The issue in the action sub judice is whether Myers acquired and held his interest in the several tracts of land involved in this action "principally" for sale to customers in the ordinary course of his business or, in other words, whether the sale of his interest in the tracts to customers in the ordinary course of his business was "of first importance" in his acquisition and holding of such interest.

During the years in question, 1962 and 1963, Myers conducted a large portion of his real estate transactions through partnerships and corporations. One of his partners and fellow stock-

holder was Milton W. Jefcoat (Jefcoat). Myers arranged for Prudential to finance the purchase of a small farm by Jefcoat soon after Myers became Prudential's representative in Mississippi. Jefcoat prospered through the years and in 1961 was a large and prosperous farmer in the Delta. Subsequent to the Government's audit of the 1962 and 1963 partnership returns of the partnership, Jefcoat died. A separate action is now pending against the Government brought by Jefcoat's widow and his estate for tax refunds based on the audits which are involved in this action. Jefcoat was associated with Myers in the Levee View, Switch-Cane and M.R.M. transactions. Myers and Jefcoat each realized a profit from the Levee View transaction of $38,470.34, and a profit of $33,069.23 from the M.R.M. transaction. Levee View was acquired January 15, 1961 and sold in January 1962. Myers and Jefcoat held Levee View for approximately one year. Myers contends that M.R.M. was acquired July 21, 1961 (the date of acquisition is in dispute) and sold the farm on March 6, 1962. Thus, the holding period for M.R.M. was less than nine months. The Switch-Cane transaction brought a profit to each partner (Jefcoat and Myers) of $25,914.46. The holding period was from February 1, 1962 until January 4, 1963, something less than a year.

Myers had other business partners during the years in question. All of the transactions during these years with these partners are not involved in this action, but, those that are involved in this action concern Robert E. Powell, a farmer, who was interested with Myers and Jefcoat in Levee View, M.R.M., and Switch-Cane; J. E. (Jimmy) Stevenson, Jr., a licensed real estate broker in Blytheville, Arkansas, who was interested with Myers in the Rich and Townsend Places; and Andy T. Arant, a farmer, who was interested in the Ingram Place transaction.

A synopsis of each transaction is helpful to an understanding of the nature and purpose of the transaction.

## LEVEE VIEW FARM

Levee View Farm prior to 1961 was owned by Frank M. and J. Everett Norfleet. The farm consisted of 1053.3 acres and was situated in Tunica County, Mississippi. Myers and Jefcoat, on January 5, 1961, contracted to purchase the property, depositing with the owners the sum of $17,000.00 as earnest money. The next day, January 6th, Myers leased his interest in the farm to Jefcoat for the year 1961. Four days later, on January 10th, Myers and Jefcoat leased the land to Robert E. Powell for the year 1961. The leases were evidenced by written agreements signed by the parties. Jefcoat and Myers formed a Mississippi corporation known as Levee View Farms, Inc. The Charter of Incorporation was issued by the Governor of the State of Mississippi on January 13, 1961, and on January 15, 1961 Myers and Jefcoat paid into the corporation the sum of $17,000.00 in return for its stock of that value. Title to the land was taken in the name of the corporation on July 12, 1961 when Frank M. and J. Everett Norfleet, the prior owners thereof, conveyed the land by warranty deed to Levee View Farms, Inc. The corporation, on November 25, 1961, contracted to transfer all of its capital stock, which would carry all of the assets of the corporation, including the plantation, to Melbia Kelso and his wife, Louise Kelso, residents of New Madrid County, Missouri. The transaction was closed on January 17, 1962 by the transfer of the stock in the corporation from Myers, Jefcoat and Powell to Kelso and his wife, who in turn conveyed to Myers and Jefcoat certain farm lands situated in New Madrid County, Missouri, as a part of the consideration for the corporate stock acquired by them.

## M.R.M. PLANTATION, INC.

On June 20, 1961 Lucius E. Burch, Jr., of Memphis, Tennessee, contracted to sell the M.R.M. Plantation to Myers and Jefcoat. The plantation contains 1125 acres and is situated in Bolivar County, Mississippi. Myers and Jefcoat

made a payment of $10,000.00 at the time the contract was consummated. On July 10, 1961 Myers, Jefcoat and Powell each subscribed to $5,000.00 of the capital stock of M.R.M. Plantation, Inc., a corporation to be organized and chartered under the laws of the State of Mississippi. Articles of Incorporation were signed by Myers, Jefcoat and Powell on July 11, 1961 and on July 18, 1961 the Charter was granted by the State of Mississippi. The corporate records reflect that Myers, Jefcoat and Powell each purchased fifty shares of the stock of the corporation on September 6, 1961. On September 28, 1961 the corporation contracted to sell the M.R.M. Plantation to Elmer E. Holmes and wife, Georgia P. Holmes. The contract provided that the corporation would cause all of its outstanding stock to be transferred to the purchasers on February 1, 1962.

The plantation was conveyed to the corporation by Burch on December 12, 1961. The corporation issued one hundred fifty shares of its corporate stock to Myers, Jefcoat and Powell, fifty shares to each, on September 6, 1961. Powell transferred his stock to Myers and Jefcoat and on December 20, 1961 the corporation issued its stock certificates to Myers and Jefcoat reflecting an ownership by each of them of seventy-five shares in the corporation. On January 30, 1962 Myers and Jefcoat transferred their stock to Holmes and his wife.

## SWITCH–CANE FARMS

Switch-Cane Farms originally contained approximately 1700 acres and is located in Bolivar County, Mississippi. As will be hereinafter noted an additional 160 acres was acquired for the farm, making it an aggregate of 1860 acres of land.

Myers and Jefcoat contracted to buy Switch-Cane from W. V. Davis and his wife, Mildred G. Davis. The contract was negotiated by a realtor who had the land for sale. The contract was signed on November 17, 1961. Prior to executing the contract Myers and Jefcoat organized Switch-Cane Farms, Inc. The Charter of Incorporation was issued November 13, 1961. The first meeting of the stockholders was held on November 24, 1961, subsequent to the execution of the contract for the purchase of the farm. Myers and Jefcoat invested $5,000.00 each in the corporation in return for fifty shares of its capital stock. The certificates were issued November 4, 1961.

W. V. Davis and his wife, Mildred G. Davis, conveyed Switch-Cane Farms to Myers and Jefcoat by deed dated February 6, 1962. Myers and Jefcoat also purchased 160 acres of land from Vance Davis, Jr. (W. V. Davis, Jr.) and his wife, Doris T. Davis. The deed to this land is also dated February 6, 1962. The 160 acre tract is adjacent to the 1700 tract, thereby resulting in the 1860 acres of land known as Switch-Cane Farms.

The corporation rented the land by written lease dated January 2, 1962, for the crop year 1962, to Robert E. Powell.

Pursuant to a resolution of the stockholders in Switch-Cane Farms, Inc., adopted January 26, 1962, the authorized capital stock in the corporation was increased from $20,000.00 to $69,000.00. On February 6, 1962 a stock certificate evidencing one hundred and eighty shares was issued to Myers and a certificate for a similar amount of stock was issued to Jefcoat. On the same date a certificate was issued to Powell for two hundred and thirty shares of the capital stock of the corporation.

Myers and Jefcoat conveyed the land to the corporation by deed dated February 8, 1962.

Sometime in June 1962 or prior thereto Myers contacted Dr. S. Gwin Robbins, a physician residing in Memphis, Tennessee, whom he had heard was interested in acquiring a farm in the Mississippi Delta. After showing Dr. Robbins the farm, Dr. Robbins immediately agreed to purchase it from Myers. A contract for sale, purchase and transfer of stock was prepared by Myers, Jefcoat and Powell and tendered to Dr. Robbins.

The contract appears to have been executed in August 1962, but the typed portion relates to the month of June 1962. A supplemental contract, which in its typed portion refers to the contract just above mentioned as being of even date therewith, also reflects that it was drafted for execution in June. The supplemental contract is, however, dated July 2, 1962. It is clear from these documents that the contact with Dr. Robbins occurred at least as early as the month of June 1962. The date for closing the transactions was fixed by the contract documents for January 1, 1963.

On August 18, 1962 the parties entered into an agreement to rescind the prior contract and supplement thereto. The recision agreement states that the contract was made July 2, 1962. The agreement also provides for the return of $20,000.00 which had been deposited by Dr. Robbins with a Greenville bank as earnest money in the transaction.

Also, on August 18, 1962, Myers, Jefcoat and Powell entered into a contract for the sale, purchase and transfer of stock with Radcliffe Investment Company (Radcliffe) to sell and transfer to Radcliffe all their stock in Switch-Cane Farms, Inc., upon the same terms and conditions as previously agreed with Dr. Robbins. The contracts provided for a cash payment of $20,000.00 to be held by the bank in escrow until delivery of the stock, and $128,000.00 additional cash when the stock should be transferred. The transaction was designed to be closed on January 4, 1963. Myers, Jefcoat and Powell reserved the 1962 crops and all other assets of Switch-Cane Farms, Inc., except the 1860 acre farm. The land was to be acquired by virtue of stock ownership, subject to certain mortgages outstanding on the land at the time. The mortgages were described in detail in the contract. The purchase price of the stock was $468,000.00 ($320,000.00 of which represented mortgages assumed by Radcliffe, the balance of $148,000.00 to be paid in cash as above indicated).

The deposition of Dr. Robbins was introduced in evidence at the trial. Dr. Robbins testified that he purchased Switch-Cane Plantation from Myers and finally closed the deal in August 1962. At the time of the transaction Myers mentioned other farms which he had for sale to Dr. Robbins, one of which was situated in Bolivar County on Highway #1, north of Switch-Cane property. Dr. Robbins had received information that Myers was interested in selling Switch-Cane Farms from a man with whom he was later associated in farming Switch-Cane.

Dr. Robbins' testimony reflects Radcliffe acquired Switch-Cane for Dr. Robbins account. The evidence reflects that cliffe acquired Switch-Cane ofr Dr. Robbins account. The evidence reflects that cliffe acquired Switch-Cane ofr Dr. Robbins account. Dr. Robbins owned property in Arkansas which he wanted to sell and which Radcliffe was interested in acquiring. The final exchange was between Radcliffe and Dr. Robbins—Radcliffe acquiring Dr. Robbins' property in Arkansas and Dr. Robbins acquiring the Switch-Cane Farms in Mississippi.

### THE INGRAM PLACE

Myers and Jefcoat contracted to purchase The Ingram Place (540.8 acres located in Washington County, Mississippi) from its owner, R. A. Ingram. The contract is dated January 31, 1962. Thereafter, Andy T. Arant was brought into the deal by Myers and Jefcoat, and on March 15, 1962, Ingram conveyed the land to Myers, Jefcoat and Arant. On December 19, 1962, Arant conveyed the one-third interest which he held in the Ingram Place to Myers and Jefcoat in exchange for their interest in a plantation situated in Bolivar County, Mississippi.

Myers and Jefcoat sold the Ingram Place to W. D. and Alta Ward Blaylock on January 2, 1963.

### THE RICH PLACE

M. H. Rich, Sr. and Jr., joined by their wives, conveyed The Rich Place in

Washington County, Mississippi, to Myers and James E. Stevenson, Jr., by deed dated May 1, 1962. As a part of the purchase money, Myers and Stevenson executed a deed of trust on the land to the sellers to secure the payment of the balance due on the purchase price in the sum of $37,000.00. Myers and Stevenson sold this property on January 2, 1963 to Myrtle F. Mason and Martha F. Evans.

This place was purchased from these parties on March 20, 1964 by Jefcoat, Myers' wife, Elizabeth L. Myers, and Alex S. Curtis. On April 6, 1965 Jefcoat and Curtis conveyed their interest in the farm to a trust created by Myers for his children, Rebecca Louis Myers and Martin P. Myers IV. Myers and his wife, Elizabeth L. Myers, created the trust on April 6, 1965.

## THE TOWNSEND PLACE

The Townsend Place in Chicot County, Arkansas, originally comprised 6000 acres. The former owner, an elderly lady, being advised by her attorney to sell the place, arranged the sale of 2700 acres of the land to Myers and J. E. (Jimmy) Stevenson, Jr.

Walter Barnes was a salesman of Stevenson, working out of Stevenson's office at Blytheville, Arkansas. Barnes was instrumental in arranging for the sale of the property to Myers and Stevenson.

The Townsend Place came into the ownership of Stevenson upon division of the partnership assets between Myers and Stevenson. The land is still owned by Stevenson.

The issue of depreciation allowances, involved in the action sub judice, concerns the improvements on the Townsend place, during the time it was owned by the partnership.

The Commissioner determined, on the audit of Myers' returns for the years 1962 and 1963, that Myers acquired his interest in the several farms involved in this action primarily for sale to customers in the ordinary course of his business as a dealer in real estate, and that the profits arising from the sale thereof should be considered as ordinary income, and taxed accordingly.

Myers correctly concedes that the finding of the Commissioner is prima facie correct and shifts the burden of proof to him to establish that the property was held for investment and not for sale to customers if he is to succeed in this action. Greene v. Commissioner of Internal Revenue, 141 F.2d 645, 646 (5th Cir. 1944); Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212, 215 (1933); Old Mission Portland Cement Company v. Helvering, 293 U.S. 289, 294, 55 S.Ct. 158, 161, 79 L.Ed. 367, 371 (1934); Pearce v. Commissioner of Internal Revenue, 315 U.S. 543, 547, 62 S.Ct. 754, 756, 86 L.Ed. 1016, 1019 (1942).

Myers testified that he acquired his interest in each of the farms as an investment with the intent to increase his farming operations, and, it was only after certain unexpected and fortuitous events occurred, did he decide to dispose of his holdings. The problem for the court is to determine whether this expression of intent is sufficient to overcome the determination made by the Commissioner, where such intent is considered in light of the other facts reflected by the evidence in this action.

The courts have formulated rules containing various elements by the use of which a determination can be made of such an issue. The frequency and continuity of sales are important, Goldberg v. Commissioner of Internal Revenue, 223 F.2d 709, 712 (5th Cir. 1955); but, are not necessarily controlling, Alabama Mineral Land Co. v. Commissioner of Internal Revenue, 250 F.2d 870, 872 (5th Cir.1957). There are other elements such as the vocation of the taxpayer at the time of the sales or prior thereto, and its relation to the transactions in question; the time for which the property was held; the extent, nature and timing of taxpayer's efforts to promote sales; the extent and

continuity of taxpayer's sales activities as compared with his other remunerative undertakings, and the substantiality of sales income as compared with taxpayer's income from other sources. Durr v. Usry, 163 F.Supp. 355 (E.D.La. 1958). See also United States v. Winthrop, 417 F.2d 905 (5th Cir.1969). In Kirby Lumber Corporation v. Phinney, 412 F.2d 598 (5th Cir.1969) the court, speaking through Judge Coleman, said:

> "This Court has several times addressed itself to the law applicable to the issue here presented. It may be briefly summarized as follows: Whether property has been held primarily for sale to customers in the ordinary course of his trade or business so that the proceeds are taxable as ordinary income rather than as capital gains is essentially a question of fact, with each case to be decided on its own peculiar facts. Specific factors or combinations of them are not controlling. We may consider the nature and character of the taxpayer's title, reason, purpose, and intent of acquisition and ownership, its duration, taxpayer's vocation, extent of its activities, extent and nature of efforts to sell, and such like." Id. at 600.

■ The court must consider the testimony of Myers and give it such weight as the court may determine it is entitled to receive. Myers' testimony is to be considered with all the other evidence in the case in determining whether Myers has met the burden cast upon him by law. The court must recognize, however, that "intent may be proved by circumstances, and that a party's testimony as to his intent may be rebutted by proof of circumstances which are inconsistent therewith." Foran v. Commissioner of Internal Revenue, 165 F.2d 705, at 707 (5th Cir.1948). The Fifth Circuit said in Tomlinson v. Dwelle (1963), 318 F.2d 60, at page 62:

> ". . . [A]lthough subjective intent honestly expressed is, of course, an important factor in determining the impact of tax statutes still reference to varying objective tests and

standards, as this Court has often stated, must be made to determine the ultimate compulsion of the statute. And finally the over-all pattern of the sales must be fitted against that of a dealer or that of an investor engaged in the liquidation of assets."

The court must, therefore, cope with the vexing and elusive problem of determining whether Myers' principal or primary purpose, when participating in the land transactions involved in this action, was to hold and sell the land for a profit, or whether his principal or primary purpose was to acquire the land as an investment and hold it for farming purposes.

Myers determined to leave Prudential at the beginning of 1961. He had experienced fifteen years of active participation in land transactions. He had qualified as an expert in land values, especially with regard to the value of farm land in the Mississippi Delta. He had retained the ownership of the Tunica County Farm which he purchased on his discharge from the Navy, but had not acquired other land. Myers, no doubt, was cognizant of the constantly increasing value of property of all kinds and in particular good farm land in the Mississippi Delta. It is reasonable to infer that he determined to leave Prudential so that he might engage in business on his own account and seek a portion of the profits awaiting real estate dealers in the market place who are aggressive enough to claim their share.

Prudential would not release Myers until mid-1961, and it was not until then that he could become active on his own account. The evidence reflects that Myers' resources were limited, and, for this reason, he called upon friends with whom he had become acquainted in his work with Prudential. Myers' previous connection with Prudential afforded him an excellent opportunity to arrange adequate financing for his real estate transactions.

Myers' first venture was the Potter Brothers land which he purchased June 6, 1961 and sold December 18, 1961.

Myers and an associate paid $176,000.00 for the property and sold the same for $196,000.00. After deducting sales expenses of $545.43, the net profit was $19,454.57, of which Myers received $9,727.25. Meyers treated this transaction on his income tax return as the sale of a long-term capital asset and this treatment was approved on audit by the Government.

On November 8, 1961 Myers purchased land from C. A. Hughes. Again Myers had other parties in the transaction with him. Myers' interest was 33⅓%. Myers and his associates paid $44,000.00 for the farm and sold it on the day of the purchase for $55,360.00. After deducting the expenses of sale amounting to $1,000.00, the profit of $10,360.00 was divided three ways, Myers' share being $3,534.33. The profit from this transaction was treated as a short-term capital gain by Myers on his individual tax return, but on audit the Government accorded ordinary income to the transaction.

On June 22, 1961, Myers individually purchased land from H. E. Simmons. Myers paid $91,000.00 for the land and before the end of the year Myers sold it for $99,540.00. There were no expenses of sale and Myers accounted for the profit amounting to $8,540.00 on his individual income tax return as gain from the sale of a capital asset held for less than six months. On audit the transaction was treated as an ordinary sale in the course of business.

Thus, before the end of the year 1961, after leaving Prudential in mid-year, Myers realized an aggregate profit of $21,720.58 in his real estate transactions.

Myers' real estate transactions for the period 1962 through 1965 were highly profitable to him. For the period 1966 through 1970 they were not as profitable, though in 1967 Myers made $60,738.00 from his real estate transactions, and $120,264.00 in 1969. The period with which we are primarily interested in the action sub judice includes the calendar years 1962 and 1963. During 1962 Myers realized from seven real estate transactions an aggregate profit of $167,118.00. Three of these transactions accounted for a total of $143,794.-42 of the total for the year of $167,118.-00.[3]

Myers contended in his 1962 income tax return that six of the seven transactions in 1962 involved the sale of a capital asset, that is, the sale of property acquired and held for investment or for farming purposes. He did not recognize any of them as transactions involving property held primarily for sale to customers in the ordinary course of business. The Commissioner, however, on audit, determined each transaction to be a transaction involving the sale of property held primarily for sale to customers rather than property held for investment purposes. Myers contests the determination made by the Commissioner as regards two of the six transactions, viz.: Levee View and M.R.M. The combined

3. The three are:
(1) Scott Heigle property, 5900 acres, profit $72,254.85. This property was purchased December 18, 1961 and sold February 1, 1962. Myers treated this transaction as one involving the sale of a capital asset held for less than six months. On audit the Commissioner accorded the transaction ordinary income status. This transaction is not involved in the action sub judice.
(2) Levee View Stock—Levee View Farms, profit $38,470.34. This property was acquired January 15, 1961 and was sold in January 1962. Myers treated this transaction as one involving the sale

of a capital asset held for more than six months. On audit the Commissioner accorded the transaction ordinary income status. This transaction is involved in the action sub judice.
(3) M.R.M. Stock—M.R.M. Plantation, profit $33,069.23. This property is said by Myers to have been acquired July 21, 1961 and sold March 6, 1962. Myers treated this transaction as one involving the sale of a capital asset held for more than six months. On audit the Commissioner accorded the transaction the status of ordinary income. This transaction is involved in the action sub judice.

profits from these two transactions, totaling $71,539.57, represent more than 40% of the total or aggregate profit for the year realized from the sale of real estate.

Myers did not report one of the seven transactions in his original return. He attributed capital gains treatment to the six which were reported, placing all of them in the same category as regards to capital assets. The Commissioner attributed the ordinary income status to all six transactions.

Myers realized a profit of $221,542.00 from real estate transactions in 1963. The profits resulted from sixteen different real estate transactions. Three of these are involved in the action sub judice. The combined profit in the three transactions amounted to $63,502.21.[4]

The evidence reflects that Myers, during the period of time involved in this action, was without sufficient resources with which to swing the several real estate transactions in which he engaged. This was the primary reason that Myers looked for outside assistance. Jefcoat was his main source of help. Jefcoat was a large landowner and also a successful business man. Myers also solicited the aid of other prominent delta farmers among whom was Arant. Myers was well acquainted with J. E. (Jimmy) Stevenson, Jr., a successful real estate broker in Blytheville, Arkansas, as well as with a real estate salesman working out of Stevenson's office, Walter Barnes. Myers and Stevenson made several purchases of large farms in the Delta, both in Arkansas and in Mississippi. Myers did not list his holdings with Stevenson but Barnes was always active in securing customers for Myers and inducing Myers to sell land to them. In fact, Barnes was active in the sale of Levee View Farms, M.R.M. Plantation and the Rich Place. Although Barnes did not participate in the sale of Switch-Cane, he received a half commission on the sale because Myers had promised him that if he (Myers) ever sold Switch-Cane he would let Barnes sell it for him. Barnes was also active in the acquisition of the Townsend Place in Chicot County, Arkansas, when it was acquired by Myers and Stevenson. As a matter of fact Barnes was in some way or another connected with all of the real estate transactions involved in the action sub judice, except the Ingram Place.[5]

---

4. The three are:

(1) The Ingram Place—540.8 acres—profit $4,664.44. This place was purchased for $95,954.00 on March 15, 1962, and sold in January 1963 for $105,456.00. The profit of $9,328.87 ($173.13 expenses deducted) was divided between Jefcoat and Myers, each taking $4,664.44. On the tax returns filed by Jefcoat and Myers this sale was treated as a sale of a capital asset, held for more than six months. On audit the Commissioner classified the profit as ordinary income.

(2) The Rich Place—569 acres, profit $32,923.31. This place was purchased for $118,800.00 on January 1, 1962 and sold on January 4, 1963 for $185,000.00. The profit of $65,846.62 ($353.38 expenses deducted) was divided equally between Jefcoat and Myers, each taking $32,923.31. On the tax returns for the year this sale was treated as a sale of a capital asset, held for more than six months. On audit the Commissioner classified the profit on the transaction as ordinary income.

(3) Switch-Cane—1860 acres, profit $25,914.46. This farm was purchased for $48,448.19 on February 1, 1962, and sold on February 4, 1963 for $100,277.10. The profit of $51,828.91 was divided equally between Jefcoat and Myers. The sale was treated on the tax return for 1963 as the sale of a capital asset, held for a period of more than six months. On audit the Commissioner classified the profit on the transaction as ordinary income.

5. On his examination by deposition Barnes testified:

"Well, now, let's keep the record—myself straight, sir. When Pickett Myers and Stevenson bought a place, we bought it to keep or sell. In other words, they bought it for an investment, but if I got a good enough price for it, they would sell it. And they wanted to keep this farm. Facts of the business I kept gouging them until I sold the farm. I got a good price for it."

It is interesting to note that the purchase money for the property purchased by Myers and his associates during 1962 and 1963, amounting to $4,054,022.00, was acquired largely through loans on the property purchased or represented by the assumption of existing mortgages on the property; and, in the same vein, the total sales amounting to $4,898,543.-00 were represented, for the most part, by mortgages given to secure a part of the purchase money of the property involved in the sale or by existing mortgages against the property assumed by the purchaser.

When Myers, Jefcoat and Powell purchased Levee View they built a manager's home and another residence thereon. They demolished twenty run-down tenant houses and used the lumber to build a large tool shed. They cleared 160 acres of land and cut a drainage canal to drain the property. Myers contends that this activity on their part supports his contention that the farm was purchased for an investment. The Government contends, and rightfully so, that the improvements added to the value of the farm and enhanced its sale at a profit. Such improvements were necessary whether the farm was bought for resale or as an investment. Myers and Jefcoat contracted to purchase Levee View Farms on January 5, 1961. The next day Myers rented his interest in the farm to Jefcoat for the crop year 1961. Myers and Mrs. Jefcoat testified that when Jefcoat and Myers contracted for the place, it was contemplated that Jefcoat would leave his home at Sunflower, Mississippi, and his extensive farming operations there and move with his family to Levee View to farm the place for the year 1961; that Mrs. Jefcoat objected and Jefcoat and Myers then leased the land to Powell for the year. The contract with Powell was executed four days later. Here, again, regardless of whether the parties held the land for resale or for an investment good business judgment dictated that during the period in which the improvements were being made the land should be cultivated to create a source of income.

Powell was brought into the Levee View operation because he was dependable and a capable farmer. The evidence does not reflect any objection by Myers or Jefcoat as to the operation of Levee View during 1961. In fact Myers testified that they became interested in Switch-Cane because it was a much larger plantation than Levee View and would afford a more profitable operation for them. Accordingly, they sold Levee View to secure funds with which to purchase Switch-Cane.

The purchaser of Switch-Cane was Dr. Gwin Robbins, as has been hereinbefore indicated. Myers testified that he and Jefcoat were forced to sell Switch-Cane to provide funds with which to pay an obligation of Powell at the bank which they had endorsed and which Powell had incurred for his furnish for the Switch-Cane operation for 1962. Myers testified further that Powell neglected the Switch-Cane crops and for that reason he determined the crops would not be sufficient to pay Powell's debt at the bank. The record reflects, however, that this decision was made early in the crop year because Myers located Dr. Robbins as a purchaser for Switch-Cane at least prior to the month of June. Myers claimed that Powell made a trip away from home, started drinking, was having family trouble, and as a result Powell was neglecting the place. This evidence is not corroborated, except, to some degree, by the testimony of Mrs. Jefcoat.

Myers gave as his reason for selling M.R.M. Plantation, soon after the purchase, was that the land was not of good quality. The purchaser, Elmer E. Holmes, testified that he became interested in purchasing a farm in Mississippi when his brother bought land near Sunflower, Mississippi; that in July 1961 he came to Mississippi and was shown land belonging to Myers and his associates, in particular the land belonging to Myers in Tunica County, Mississippi, the Myers'

homeplace, and Levee View, M.R.M. Plantation and the Rich Place. The testimony is uncontradicted that Barnes showed Holmes all of the Mississippi farms. Holmes testified that the cotton crop on M.R.M. Plantation looked good and he purchased the place in September 1961; that he farmed the land in 1962 and 1963; and that in 1962 and 1963 he made about a bale and a quarter of cotton to the acre, twenty-five bushels of beans to the acre in 1962 and fifteen bushels of beans to an acre in 1963. Holmes sold the land back to Myers and Jefcoat after the 1963 crop year, not because he was dissatisfied with the quality of the land, but because he injured his back and was forced to have an operation for the removal of a disc. Myers testified that he and Jefcoat made a social call on Holmes and learned that Holmes wanted to sell the land because of his back condition; that he and Jefcoat bought the land from Holmes and sold it to a friend of theirs for a profit, after the purchaser visited and inspected the land.

Myers testified that he, Jefcoat and Arant bought the Ingram place for the purpose of operating it as a farm; that Arant was a good farmer and was going to rent the place and work the land. However, shortly after purchasing the property Jack Blaylock came to him and wanted to rent the place. Myers knew Blaylock to be a good farmer, and, as Arant could secure another place, they rented the land to Blaylock. At the close of the 1962 crop year Blaylock and his father bought the place. They offered Myers and Jefcoat (Jefcoat and Myers in the meantime had acquired Arant's interest in the place) such an attractive price for the farm they decided to sell. As has been mentioned hereinbefore, the Ingram Place was purchased March 15, 1962. Myers and Jefcoat sold it to the Blaylocks on January 2, 1963. The profit on the sale was $9,328.87, or $4,664.44 for each of them.

The Rich Place was purchased by Myers and Stevenson, after Walter Barnes informed them the place was for sale. The place originally had 1490 acres, but in the transaction Howard New acquired 920 acres and Myers and Stevenson the balance, or 570 acres. Myers and Stevenson rented the land to a tenant for the crop year 1962. Myers and Stevenson secured an option on the land on August 10, 1961. The option was exercised May 1, 1962. Myers and Stevenson decided to terminate their partnership, and in settling the partnership's affairs this property was sold. The sale was accomplished January 2, 1963. After the sale Myers reacquired the property and conveyed it to a trust which he had theretofore established for the benefit of two of his children. Holding the place only a year, Myers and Stevenson made a profit in the transaction of $65,846.62, or $32,923.31 each.

In the division of the partnership property Myers conveyed his interest in the Townsend Place to Stevenson, who has since retained the property. During the period of ownership by the partnership, the partners claimed depreciation deductions on the assets situated on the land. Myers claims that these deductions were proper because the property was held for the production of income. The Commissioner disallowed the deductions, contending that the property was held for sale to customers in the ordinary course of the trade or business of the parties.

The discussion hereinbefore made does not touch upon all facts reflected by the record, but is sufficient to form a basis for the ultimate finding of the court on the paramount and controlling issue in the case.

Myers' case must rest, to a large extent, upon his declaration of interest. The corroborating evidence consists largely of Mrs. Jefcoat's testimony.

She, like Myers, is an interested party. Very little corroboration is to be found in the record, other than the testimony of Mrs. Jefcoat. When the evidence is sifted, the court is faced with the problem of whether Myers' declaration of purpose is sufficient to overcome the presumed correctness of

the Commissioner's determination. The court is not convinced that it does.

The court concludes, therefore, after considering all of the evidence in the case, the entire record and briefs of counsel, that Myers has not met the burden imposed upon him by law to overcome the determination made by the Commissioner.

The court, therefore, finds that Myers' interests in the farms which are involved in the action, and to which reference has been hereinbefore made, were held primarily for sale to customers in the ordinary course of Myers' trade or business as a dealer in real estate, and that the profits Myers realized upon their sale constituted ordinary income.

This holding renders moot the questions as to depreciation on the Townsend Place assets and the holding period of the M.R.M. stock.

The court will enter a final judgment denying plaintiff any relief, and dismissing the action on the merits of plaintiff's costs.